# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES,
Attorney General of the State of New York,

                              Plaintiff,

                   -against-

AARON D. FISCHMAN, STEPHEN BROWN,
STEVEN HOFFMAN, LAWRENCE KATZ,
SETH ROSENBLATT, CARDIS ENTERPRISES
INTERNATIONAL N.V., CARDIS ENTERPRISES
INTERNATIONAL (U.S.A.) INC.,
CARDIS ENTERPRISES INTERNATIONAL B.V.,
CHOSHEN ISRAEL LLC, LAW OFFICES OF
LAWRENCE KATZ, ESQ. PLLC, LAW OFFICES OF
LAWRENCE KATZ P.C., and ZERP LLC,

                          Defendants,

                   -and-

NINA FISCHMAN, RAFAELA FISCHMAN,
ALEXANDER FISCHMAN, STUART FISCHMAN,
ANNE SHIMANOVICH, and ETHEL WEISSMAN,

                       Relief Defendants.

-----------------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**

Index No. 452353/2018

1.      Plaintiff, The People of the State of New York, by Letitia James, Attorney

General of the State of New York, alleges the following against:  (a) Defendants Aaron D.

Fischman, Stephen Brown, Steven Hoffman, Lawrence Katz, Seth Rosenblatt, Cardis Enterprises

International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises

International BV, Choshen Israel, LLC, Law Offices of Lawrence Katz, Esq. PLLC, Law Offices

of Lawrence Katz P.C., and Zerp LLC (the "Defendants"); and (b) Relief Defendants Nina

Fischman, Rafaela Fischman, Alexander Fischman, Stuart Fischman, Anne Shimanovich, and Ethel Weissman (the "Relief Defendants").

## NATURE OF THE ACTION

2.      From 1998 to present, Defendant Aaron D. Fischman operated the Cardis entities – Defendant Cardis Enterprises International N.V. ("Cardis NV"), Defendant Cardis Enterprises International BV ("Cardis BV"), and Defendant Cardis Enterprises International (U.S.A.) Inc. ("Cardis USA") (together, "Cardis" or the "Company").

3.      Cardis claimed to possess patented and proprietary technology to make low-value credit card transactions less expensive for merchants.  Credit card transactions include a fixed fee, regardless of the size of the transaction, which has the effect of severely depressing margins on low-value transactions.  For example, a $1 credit card purchase at a convenience store might incur a fixed processing cost of $0.10 for the store.  Cardis claimed that its technology allowed merchants to aggregate low-value transactions, so that this fixed fee would be incurred less frequently.

4.      Cardis solicited tens of millions of dollars from investors by selling stock in Cardis NV.  Although Cardis did not maintain full shareholder records, Defendant Fischman has represented that Cardis raised over $70 million, and a Cardis-maintained share registry reflects at least $30 million in stock sales since 2011.  Cardis also raised significant funds through loans.

5.      Cardis was a fraud.  It raised money through a steady drumbeat of false representations that:  (1) it was on the verge of monetizing its technology through agreements with prominent companies; and (2) an initial public offering ("IPO") or buyout of Cardis was on the horizon.  All the while, Defendant Fischman diverted investor moneys to enrich himself, family members, and favored charities.  While the particulars of the fraud varied, these acts and

practices were part of a single, continuing scheme to deceive investors and enrich Defendant Fischman. Defendant Fischman was aided in these efforts by the other Defendants.

6.  Many Cardis investors were particularly vulnerable to Defendants' fraud because they were members of a close-knit religious community, to which many of the Defendants also belonged, located in the New York metropolitan area.

7.  Although centered in New York, Cardis' fraud was far-reaching. It ensnared investors with relatively modest means, as well as individuals with substantial fortunes. Cardis deceived investors of all levels of sophistication, including highly sophisticated business people and attorneys. And it lured many investors to make repeat investments in the Company.

## PARTIES

8.  Plaintiff brings this action by and through Attorney General Letitia James.

9.  The Attorney General is the chief law enforcement officer of the State of New York and is charged by law with protecting the integrity of the business and securities markets within New York, as well as the economic health and well-being of investors who reside or transact business in the State.

10.  The Attorney General is authorized to bring this action and to assert the causes of action set forth below pursuant to General Business Law § 352 et seq. (the "Martin Act") and Executive Law § 63(12), and under the common law pursuant to the Attorney General's *parens patriae* authority.

11.  Defendant Cardis BV was incorporated in the Netherlands in 1996.

12.  Defendant Cardis NV was incorporated in Curaçao under the former laws of the Netherlands Antilles in or around 2006. The principal place of business of Cardis NV is the

Country of Curaçao, a Lesser Antilles island that is a constituent country of the Kingdom of the Netherlands.

13.     Defendant Cardis USA was incorporated in Delaware on June 20, 2013 and registered to do business in New York State on June 27, 2013.  At all relevant times, its principal place of business was located at 445 Central Avenue, Cedarhurst, New York, 11516, and it was a wholly owned subsidiary of Cardis NV.  The current entity status of Cardis USA for the conduct of business in New York State is "suspended," according to the website of the Division of Corporations of the New York State Department of State.

14.     The Cardis entities did not observe customary corporate formalities.  Instead, they:  (1) had no independent capitalization; (2) shared personnel; (3) were dominated by Defendant Fischman, who controlled the terms of deals with investors, the use of the proceeds, and Cardis' third-party relationships; and (4) were employed to further the fraud conceived by Defendant Fischman.  For that reason, the Cardis entities are simply referred to as "Cardis" throughout this Complaint.

15.     Defendant Choshen Israel LLC ("Choshen") is a New York limited liability company formed on January 4, 1999, with its principal place of business at relevant times at 445 Central Avenue, Cedarhurst, New York 11516.  Choshen is controlled by Defendant Fischman, and Defendant Fischman received payments from Cardis through Choshen.  Many investors' investments in Cardis were through subscription agreements with Choshen.

16.     Defendant Law Offices of Lawrence Katz, Esq. PLLC is a New York professional service limited liability company formed on February 29, 2012 by Defendant Katz for his practice of law.  Prior to becoming inactive on January 25, 2012, Law Offices of Lawrence Katz

4

P.C. was the law firm through which Defendant Katz engaged in the fraudulent and illegal acts and practices described herein.

17.     Defendant Zerp LLC is a New York limited liability company, formed by Defendant Steven Hoffman and registered to his home in Lawrence, New York. It received payments on Defendant Hoffman's behalf.

18.     Defendant Aaron D. Fischman was, at all relevant times, a principal, officer, director, and/or control person of Cardis NV, Cardis USA, and Cardis BV. Defendant Fischman formally served as Cardis' Chief Executive Officer until 2016 but continued to exercise control over Cardis thereafter.

19.     Defendant Stephen Brown was, at relevant times, the most senior financial executive at Cardis and was variously described as its Chief Financial Officer, Vice President of Finance, and/or Senior Financial Executive.

20.     Defendant Seth Rosenblatt was, at relevant times, a director of a Cardis subsidiary, Cardis R&D Ltd., and a director of Choshen.

21.     Defendant Steven Hoffman was, at relevant times, an agent of Cardis NV authorized by that company to offer and sell its securities to the public in and from New York State.

22.     Defendant Lawrence Katz, Esq. is, and was at relevant times, a member of the bar of the State of New York. At relevant times, Defendant Katz maintained Interest on Lawyer Account ("IOLA") bank accounts for the benefit of Defendants Cardis NV and Cardis USA. Defendant Katz deposited investor moneys into his firms' bank accounts in connection with his participation in the fraudulent investment schemes described herein.

23.     Relief Defendant Nina Fischman is the spouse of Defendant Fischman.

24.     Upon information and belief, the other Relief Defendants – Rafaela Fischman, Alexander Fischman, Stuart Fischman, Anne Shimanovich, and Ethel Weissman – are all family members of Defendant Fischman.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action, personal jurisdiction over the Defendants and Relief Defendants, and authority to grant the relief requested pursuant to General Business Law § 352 et seq., Executive Law § 63(12), and the common law.

26.     Pursuant to C.P.L.R. § 503, venue is proper in New York County, because Plaintiff resides in that county, and because a substantial part of the events and omissions giving rise to the claims occurred in that county.

## FACTUAL ALLEGATIONS

27.     Since 1998, Cardis obtained tens of millions of dollars from investors through sales of stock, warrants, and convertible notes – all of which are securities under GBL § 352(1). Cardis offered and sold these securities to more than one hundred investors.

28.     Cardis was tightly controlled by Defendants Fischman, Brown, Katz, Hoffman, and Rosenblatt, who worked together in a small office space, on a single floor, in Cedarhurst, New York.

29.     Defendant Fischman was a founder of Cardis and ran it through his own company, Defendant Choshen.  Defendant Fischman personally raised significant funds for Cardis based on false representations and omissions, prepared key investor marketing materials that were also false, and was the primary decision maker in Cardis' pursuit of revenue generating third-party relationships.

30.     Defendant Katz was Cardis' in-house counsel and controlled a number of Cardis

bank accounts, including Cardis' principal bank account, which was in the name of his law firm.

Defendant Katz abused this role by aiding in Defendant Fischman's theft from the Company and

by diverting Company moneys to himself.

31.     Defendant Brown was Cardis' senior financial officer.  His principal role at

Cardis was to draft and send investor update letters, which contained a host of false statements

and omissions, based on information provided by Defendant Fischman.  Many Cardis investors

made additional investments in Cardis in reliance on these letters.

32.     Defendant Hoffman was one of Cardis' principal fundraisers raising, upon

information and belief, over $20 million from investors.  Defendant Hoffman operated on a

commission basis with investment-based commissions directed to him or his company,

Defendant Zerp LLC.  Defendant Hoffman relied on the investor updates prepared by Defendant

Brown and information from Defendant Fischman – both of which contained material

misstatements and omissions – in making his pitches to investors.

33.     Defendant Rosenblatt operated under the direction of Defendant Fischman and

had significant responsibilities in interacting with investors.  Defendant Rosenblatt distributed

false investor update letters prepared by Defendant Brown, which Defendant Rosenblatt was also

on the distribution list to receive.  Defendant Rosenblatt also frequently interacted with investors

via email and telephone.

34.     Cardis induced investors to purchase shares of stock in Defendant Cardis NV by

means of material misstatements and omissions of material facts in both oral and written

communications, including, but not limited to, emails, text messages, telephone calls,

PowerPoint presentations, investor update letters, subscription agreements, and private

placement memoranda.

35.     These misrepresentations and omissions centered on:  (1) Cardis' business prospects; (2) Defendant Fischman's exploitation of Cardis for personal benefit; and (3) Cardis' key personnel.

36.     The Defendants were obligated, and failed, to correct or update these misleading statements and omissions.  Instead, since at least 2012 and continuing to the present, Defendants reaffirmed their false statements and omissions and covered up their malfeasance, even when confronted by concerned investors.

**I.      Defendants' Misrepresentations and Omissions Concerning Cardis' Business Prospects**

37.     As detailed below, Cardis misrepresented its business prospects in two principal respects:  (1) Cardis falsely claimed it was on the verge of revenue-generating relationships; and (2) Cardis falsely claimed that an IPO or buyout was on the horizon.

**A.      Cardis' Third-Party Relationships**

38.     As discussed above, Cardis claimed to possess proprietary technology to aggregate low-value credit card transactions.

39.     Cardis' business plan generally centered on generating revenue from third parties who participated in low-value transactions – either in the financial services industry (like banks and credit card companies) or as merchants (like convenience stores).

40.     These parties could potentially benefit from the ability of Cardis' technology lower the costs of low-value transactions in two principal ways:  (a) through increased

acceptance and use of credit cards, resulting in a net benefit to the financial services industry; and (b) through benefits to merchants by lowering their direct costs.

41.     In turn, these third parties could compensate Cardis based on the revenue or savings generated by Cardis' technology.  Because Cardis' technology was focused on saving pennies on small dollar transactions, for Cardis to be successful, it would need to achieve large scale use of its technology.

42.     Consistent with this premise, Cardis sought to develop partnerships with prominent companies that operated on a large scale and were regularly involved in low-value transactions, including businesses involving financial services, vending machines, online music, parking, and convenience stores.

43.     The potential to generate revenue through these types of partnerships was equally central in Cardis' pitch to investors.

44.     From at least 2011 to present, Cardis has presented itself to investors as being on the verge of monetizing its technology through these types of partnerships.

45.     During that period, Cardis touted at least 15 partnerships – many with brand-name companies – and led investors to believe that it was on the precipice of earning enormous profits.

46.     In fact, Cardis repeatedly overstated the strength of its third-party relationships, which Cardis' business model depended upon, many of which did not advance beyond preliminary discussions.

47.     The third parties included:  Raiffeisen Bank (Austrian Bank); Sberbank (Russian Bank); Mastercard (financial services company); Spindle (smart vending machine company); Roc Nation (entertainment company); LISNR (technology company); PrimaryWave (entertainment company); PureSolo (music mobile application); All Def Digital (media

company); ByStorm Entertainment (media company); Sony Music (music company); Warner Music (music company); Universal Music (music company); Municipal Parking Services (provider of smart parking meter apps and other parking-related services); and Cumberland Farms (chain of convenience stores and gas stations).

48.     Defendants' written material misstatements and omissions, which generally tracked Defendants' oral representations, included statements concerning each of these third parties.

49.     *Raiffeisen, Sberbank, and Others*.  On December 12, 2012, a Cardis employee emailed a prospective investor, noting that Cardis had signed a "commercial contract with Raiffiesen [sic] for implementation in Austria in 2012."  Cardis also stated that it had a "[s]igned LOI" (letter of intent) and was in "contract negotiations with Sberbank – Russia (2012 implementation)."  Cardis stated further that it was in discussions or engaged with a number of other companies.  Cardis juxtaposed these relationships with a projected profit and loss summary, prepared by Defendant Brown, which estimated over $9 million in revenue in 2013, $18 million in 2014, and over $1 billion in revenue by 2023.

50.     In actuality, there was no basis for these projections based on Cardis' then-existing relationships, which were entirely preliminary in nature.  For example, Cardis' relationship with Raiffeisen never advanced beyond a pilot program.

51.     *Spindle*.  On August 15, 2013, in a letter to investors, Defendant Brown represented the following:  "Cardis expects to be seeing revenues from the vending machine opportunity in its joint venture with Spindle as early as January 2014.  To understand the enormity of this one specific opportunity, Spindle's contacts in the vending machine business alone can give Cardis access to over one million vending machines by 2015 with Cardis' share of

the potential profit from these machines being in excess of $25M of free cash flow per year."

52.     In actuality, at the time of the letter, there was no joint venture.  Nor was there ever a joint venture between Cardis and Spindle.  Cardis and Spindle had only entered into a mutual confidentiality agreement and letter of intent.  Moreover, no work had been done to integrate Cardis' technology, and Cardis' technology was never incorporated into Spindle.

53.     *Roc Nation/LISNR.*  From February 2014 through June 2016, Defendants repeatedly represented that:  (1) Cardis had agreements with both Roc Nation and LISNR; (2) LISNR would host a Roc Nation mobile store that would embed Cardis' technology; and (3) the Roc Nation store would soon be rolled out.

54.     For example, on December 24, 2014, Defendant Rosenblatt and another Cardis employee emailed to investors a letter written by Defendant Brown, based on information originally provided by Defendant Fischman, which represented the following:  "ROC NATION - expected to go live January/February 2015 . . . Cardis is to be the official payment system for Roc Nation's on-line store and mobile apps showcasing 20 of Roc Nation's artists, including Rianna [sic] and JCole.  We have done a Beta Pilot of the site and we recently received a demo which has been successfully reviewed by our technical staff.  We received comments from Roc Nation on the final contract are [sic] we are close to finalizing."

55.     In actuality, Cardis never signed any agreement with Roc Nation, and its agreement with LISNR was solely a statement of work to create a mobile application.  Neither LISNR nor Roc Nation ever agreed that LISNR would host a Roc Nation mobile store.  The Roc Nation/Cardis store was never close to launching.  LISNR never even released the application to Cardis because Cardis failed to pay LISNR for its work.

56.     *Sony, Warner, and Universal.*  From March 2014 to December 2014, Defendants

11

represented in written communications that Cardis would soon finalize agreements with each of the three major music labels: Sony, Warner, and Universal. For example, in May 2014, Defendant Brown claimed that Cardis would be finalizing its agreement with all three major labels within the following 30 to 60 days.

57.     In actuality, Cardis did not advance beyond high-level preliminary discussions with these music labels, and there was no basis to represent that Cardis would soon finalize agreements with the labels. For example, at the time of Defendant Brown's representation, only one introductory meeting between Cardis and each music company had taken place, and the parties had not even executed non-disclosure agreements.

58.     *Mastercard.* From March 2014 through December 2014, Defendants repeatedly represented in written communications that Cardis' technology would be integrated into Mastercard, that Mastercard believed that Cardis was central to its ambitions in the music industry, and that Mastercard was contemplating a significant investment in Cardis.

59.     For example, on May 6, 2014, Defendant Fischman wrote: "The head of MC global endorsements told me that music is the cornerstone of MC's global strategy and that Cardis is strategy [sic] to achieve this . . . We got something hot!!"

60.     In actuality, Cardis and Mastercard never materially advanced beyond technical discussions as to the feasibility of integrating Cardis' technology into Mastercard. Mastercard did not view Cardis as key to its strategy in the music industry. In fact, a partnership with Cardis could have jeopardized Mastercard's significant relationship with Apple because Cardis sought to create a Roc Nation music store that would compete with Apple's iTunes store. Mastercard never contemplated a financial investment in Cardis.

61.     *PureSolo.* In November and December 2014, Defendants Brown and Rosenblatt

12

sent letters to investors reporting that Cardis was finalizing an agreement with PureSolo – a karaoke mobile application company. The letters represented that Cardis would be "the exclusive payment system for PureSolo who projects to sell a minimum of 12 Million recordings per annum at a price of $1.95 per transaction."

62. In actuality, these representations were false. First, there was no agreement between Cardis and PureSolo for Cardis to be "the exclusive payment system for PureSolo." PureSolo was only obligated to use Cardis' technology in PureSolo applications to the extent that Cardis was providing the marketing funds for that particular application. Additionally, the agreement only covered Android devices and did not include Apple IOS devices. Second, PureSolo's planned price point was $0.99 per transaction, not $1.95 per transaction, as Defendant Brown falsely represented. Third, PureSolo did not project a figure as high as 12 million sales per year.

63. *ByStorm*. In November and December 2014, Defendants Brown and Rosenblatt sent letters to investors stating that Cardis was finalizing an agreement with ByStorm Entertainment to be its exclusive payment system and would "go live in late January 2015."

64. In actuality, Cardis was not finalizing any agreement with ByStorm to be its exclusive payment system. The companies only had one introductory meeting.

65. *PrimaryWave*. In November and December 2014, Defendants Brown and Rosenblatt sent letters to investors reporting: "Cardis is in advanced negotiations to become the payment processor for Primary Wave."

66. In actuality, PrimaryWave never entered into any negotiations with Cardis. At the time of these representations, Cardis and PrimaryWave had held only a single meeting, and PrimaryWave was waiting for Cardis to demonstrate Cardis' technology to PrimaryWave. That

INDEX NO. 452353/2018

RECEIVED NYSCEF: 08/30/2019

demonstration never occurred, and there are no e-mails between the parties after November 7, 2014.

67.     *All Def Digital*.  On or about December 24, 2014, Defendant Rosenblatt emailed to investors a letter written by Defendant Brown, representing the following:  "ALL DEF DIGITAL (ADD) – expected to go live in February 2015[.]  Cardis is finalizing its agreement to be the exclusive payment system for All Def Digital, who is the pioneer record label in its revolutionary approach to market digital videos online."

68.     In actuality, nothing was expected to go live in the next two months, and Cardis was not finalizing any agreement with All Def Digital.  All Def Digital was not even in the retail business.

69.     *Municipal Parking Services.*  From June 2016 through September 2016, Defendants Fischman and Hoffman made written representations that Cardis' technology would soon be, or had already been, embedded in Municipal Parking Services' smart parking meters in Cedarhurst, New York.  For example, on September 6, 2016, in an email to a Cardis investor, Defendant Fischman wrote:  "The meters go live within 30 days so revenue will begin."

70.     In actuality, Cardis never rolled out its technology in Cedarhurst parking meters and was never on the verge of doing so, particularly because the town never approved the use of Cardis' technology and because MPS required, and Cardis failed to obtain, compliance with a payment industry protocol called PCI.

71.     *Cumberland Farms*.  From August 2016 to January 2017, Defendants Fischman, Brown, and Hoffman represented that Cardis would soon enter into a revenue-generating relationship with Cumberland Farms.

72.     In actuality, Defendants had no basis in August 2016 – or ever – to represent that

a deal with Cumberland Farms was in an advanced stage. Cardis had only a single meeting with Cumberland Farms, which did not occur until November 30, 2016. Thereafter, Cumberland Farms did not pursue a deal with Cardis.

73.     These third-party relationships were material to investors because, as described above, Cardis' business model depended on: (a) partnering with third parties; (b) those third parties generating revenue or savings through the use of Cardis' technology; and (c) Cardis earning revenue based on the performance of these third parties.

**B.      IPO or Buyout**

74.     In addition to misrepresenting its prospects of revenue-generating partnerships, Cardis also falsely represented that an IPO or buyout of Cardis was on the near-term horizon.

75.     From in or around 2011 to present, Defendants repeatedly represented that an exit opportunity was around the corner, including by offering specific estimates that an exit was expected, with estimates ranging from a few months to 12 months to two years.

76.     On October 18, 2013, Defendant Rosenblatt wrote the following to an investor: "We [Cardis] now believe that the company will be doing an IPO within the next twelve months."

77.     On January 22, 2014, Defendant Brown wrote the following: "The exit strategy remains the same – an IPO or merger. Just becoming a major process in the music and mobile payment industry alone can give us a multiple billion dollar valuation and is very achievable. We think we can become a major force in the industry by the end of 2014."

78.     In February 2014, Defendant Fischman told an investor that he expected an IPO in 12 months at 10 to 30 times the value at which Cardis stock was then being sold.

79.     On May 25, 2014, Defendant Brown wrote the following to an investor: "Most

important to our long term shareholders, the expanding opportunity with Mastercard can lead to the most diverse and greatest opportunities both business-wise and to a possible investment which hopefully can lead to a final exit down the road."

80.     In August 2018, Defendant Fischman texted an investor that an IPO would occur in the next week.

81.     In fact, there was never an exit opportunity on the horizon.  Moreover, the notion of an exit opportunity was far-fetched for several reasons.

82.     First, Cardis failed to maintain appropriate books and records that would be necessary for these types of transactions.  Cardis did not maintain a comprehensive share registry beyond an incomplete handwritten shareholder registry on a legal notepad.  Many Cardis investors never even received stock certificates.  Similarly, Cardis failed to maintain consolidated company financial statements, or even a simple revenue and expense ledger.

83.     Second, Cardis generally failed to develop ongoing revenue streams and was instead dependent on new investor moneys.

84.     Third, any exit transaction would likely necessitate a more thorough review of Cardis' business.  That review would demonstrate that Cardis' representations about its relationships were false and that Defendant Fischman was siphoning huge sums of money for himself.

85.     These misrepresentations concerning exit opportunities were material to Cardis investors because they represented an opportunity for the investors to profit from their investments.

## II.      Defendant Fischman's Exploitation of Cardis

86.      While Cardis raised tens of millions of dollars based on its fraudulent misrepresentations, Defendant Fischman treated the Company as his own personal piggy bank.

87.      First, Defendant Fischman, with the assistance of Defendant Katz, who controlled the principal Cardis bank account, siphoned off huge sums to enrich Defendant Fischman personally.

88.      Cardis and Defendant Fischman represented, and investors understood, that investor funds were needed, and were to be utilized, for the development of Cardis' technology and third-party relationships.

89.      They failed to disclose, however, that Defendant Fischman was receiving huge sums to manage the Company, receiving at least $3 million through his closely-controlled company, Defendant Choshen, from January 2011 to present.

90.      There is no written agreement between Choshen and Cardis that would justify these payments, and the payments are irregular in amount, frequency, and timing.  Upon information and belief, Defendant Fischman simply disbursed moneys to himself as necessary to support his own lifestyle.

91.      Second, Cardis, Choshen, Defendant Fischman, Defendant Rosenblatt, and Defendant Hoffman were all aware of, and failed to disclose that, Defendant Fischman repeatedly gave away Cardis stock to placate disgruntled investors in other failing companies backed by Defendant Fischman, thereby diluting the value of Cardis investors' stock without their knowledge.

92.     For example, Defendant Fischman gave his movie production partner $40,000 worth of Cardis shares in exchange for the partner's $40,000 investment in the movie, which failed at the box office.

93.     Similarly, Defendant Fischman directed Defendant Hoffman to tell an investor that Defendant Fischman would give the investor free Cardis stock in exchange for the investor's failed investment in another Fischman-related company.

94.     Likewise, on March 25, 2014, Defendant Fischman gave a Cardis investor nearly two million Cardis shares for zero consideration in exchange for the investor's June 2008 investment in another Fischman-related company, which ultimately failed.

95.     And, on August 28, 2016, a Cardis investor emailed Defendant Fischman, asking the following:  "[R]egardless of a new investment, [are you] willing to offer the equivalent shares in Cardis to cover our disappointing investment in" another Fischman-related company. Defendant Fischman responded as follows:  "We will issue the replacement equity for [the company], need to determine price."

96.     Third, Defendant Fischman and Defendant Katz diverted Cardis moneys to pay for Defendant Fischman's personal credit card expenses, which were substantial, and catering expenses for Defendant Fischman's personal events.   Defendant Rosenblatt was aware of Defendant Fischman's use of a corporate credit card for personal purposes because the card was issued in Defendant Rosenblatt's name.

97.     Fourth, Defendant Fischman and Defendant Katz engaged in the conversion of investor funds by fraudulently and illegally taking Cardis moneys and distributing them to others who had no right to the money.

98.     This includes the Relief Defendants who, upon information and belief, are Defendant Fischman's family members.

99.     Relief Defendant Nina Fischman received at least $2 million of Cardis' investor moneys.

100.     Relief Defendant Stuart Fischman received at least $71,000 of Cardis' investor moneys.

101.     Relief Defendant Rafaela Fischman received least $19,000 of Cardis' investor moneys.

102.     Relief Defendant Alexander Fischman received at least $36,500 of Cardis' investor moneys.

103.     Relief Defendant Anne Shimanovich received at least $280,000 of Cardis' investor moneys.

104.     Relief Defendant Ethel Weissman received at least $129,000 of Cardis' investor moneys.

105.     Furthermore, Defendants Fischman and Katz directed more than $1 million in investor moneys to religious charitable organizations.

106.     Finally, in addition to aiding and abetting Defendant Fischman's conversion of investor funds, Defendant Katz also converted investor funds for his own benefit.

107.     From in or about March 2011 to in or about May 2016, Defendant Katz transferred more than $2.5 million from a Defendant Katz-controlled IOLA account at Bank of America, in which Cardis' investor moneys were deposited, to Defendant Katz's accounts maintained at Signature Bank, JPMorgan Chase, and HSBC Bank USA.  The transfers included: (1) $50,000 to a Defendant Katz-controlled account at Signature Bank; (2) more than $750,000

19

to Defendant Katz-controlled accounts at JPMorgan Chase; and (3) more than $1.7 million to Defendant Katz-controlled accounts at HSBC Bank USA. These transfers were frequently used to fund Defendant Katz's own personal expenses such as groceries, restaurants, and clothes.

108.    These misrepresentations and omissions were material to investors because they bore on the integrity of key Company personnel, the mismanagement of the company and lack of meaningful financial controls, and because investors believed their moneys were going towards the development of the Company and not the personal enrichment of its personnel.

## III.    Defendants' Key Personnel

109.    Defendants also made misrepresentations and omissions concerning key Cardis personnel.

110.    First, Defendants Cardis, Choshen, and Fischman failed to disclose Defendant Fischman's problematic history in the securities industry.

111.    Specifically, they failed to disclose that, in 1995, Defendant Fischman was permanently barred by the National Association of Securities Dealers ("NASD") from associating with any member of NASD in any capacity.[1]  At that time, NASD was a securities industry self-regulatory organization and was one of the predecessors of the Financial Industry Regulatory Authority, Inc. ("FINRA").  Defendant Fischman's bar was part of a settlement of NASD allegations that he had:  manipulated the price of a penny stock; failed to provide required risk disclosure statements to customers prior to effecting trades in that penny stock; failed to provide the inside bid and ask quotations for the penny stock; failed to disclose the compensation to be received by his firm and his firm's associated persons; and failed to appear and provide testimony in connection with the investigation.

---

[1] *See* https://files.brokercheck.finra.org/individual/individual_1391938.pdf.

112.     This information would have been significant to investors because it bore on the integrity of Cardis' principal officer and because Cardis was itself a penny stock.

113.     Second, Defendants Cardis, Fischman, Brown, Hoffman, and Rosenblatt also misrepresented the status of Defendant Brown.

114.     Defendant Brown was variously touted as serving as the Chief Financial Officer, Vice President of Finance, and/or Senior Financial Executive, but he did not perform many of the core duties generally associated with these senior finance positions.  For example, Cardis did not maintain:  (i) a formal share registry; (ii) a basic income statement; or (iii) comprehensive records of its debts and obligations.

115.     Defendant Brown's true role would have been significant to an investor. Defendant Brown was personally highly regarded for his prior work as a senior executive at a major public company, as well as for being a significant charitable donor in the Long Island communities in which Defendants lived and transacted business.  Defendant Brown's titles created the impression that he was highly involved with Cardis' finances, although he was not, and that Cardis was observing traditional corporate financial formalities, which it was not.

**IV.     Defendants' Failure to Correct or Update**

116.     Defendants failed to correct or update these misleading statements and omissions. Cardis never told investors the truth that these third-party relationships were not as advanced as claimed, that Cardis was not on the verge of monetization, and that no exit opportunity was on the horizon.  Nor did Defendants disclose Defendant Fischman's improper use of Company moneys.  In fact, on multiple occasions, when confronted with claims of malfeasance, Defendants reaffirmed the misrepresentations and omissions.

117.     In summer 2012, Cardis investors raised concern as to "what funds have been spent to date trying to get the Company off the ground," including "[w]hat compensation" was received by the officers, the "hype that [investors] received at the time of investment," and that Cardis was a "ponzi scheme." Defendant Brown, Defendant Rosenblatt, and others met with Cardis investors to dissuade them from these concerns.

118.     In July 2014, a Cardis investor wrote Defendant Fischman, Defendant Hoffman, and Defendant Rosenblatt, raising his concern that multiple investors had called him "to inquire about whether I know anything about the operation you guys are running, implying that they believe that you guys are involved in a real fraud." The investor noted that "[t]hese people are getting very restless . . . because . . . you guys have been telling them you are very close to a great deal for many years now and they no longer believe you."

119.     Defendant Brown, Defendant Rosenblatt, and Defendant Fischman then coordinated a response dismissing the concerns as the product of a "few, minority, [sic] investors who continue to be angry at us, mostly because their investment has not been realized to date." They went on to reject "accusations of a PONZI scheme" as "absurd on every level." They affirmed the accuracy of their past representations and also made additional misrepresentations about Cardis' business prospects.

120.     On September 24, 2015, a Cardis investor emailed Defendant Brown asking for the "latest on Cardis" and whether it was "a complete loss," while mentioning a recent investor lawsuit. Defendant Brown, copying Defendant Rosenblatt, responded that the lawsuit claiming fraud was "frivolous," while claiming that Cardis' relationship with Roc Nation was "developing" and ongoing. In fact, the lawsuit had merit, and Cardis' relationship with Roc Nation was long over.

121.    On February 28, 2018, a Cardis investor recorded a telephone conversation with Defendant Brown.  The investor asked "what happened to the cash" investors put into Cardis. Defendant Brown responded by detailing the Company's large budget and staff, while failing to disclose the substantial misuse of investor funds.  The investor also questioned Defendant Brown about various investor lawsuits against Cardis and its principals.  The investor asked:  "After reading those lawsuits, why should we think that the company has any future?"  In response, Defendant Brown told the investor "the lawsuits were not the most credible lawsuits," attributing them to "angry investors."  Defendant Brown later told the investor "none of those lawsuits have any merit to them."  In fact, there was substantial merit to the investor lawsuits.

122.    These misrepresentations and omissions were material to investors because they bore directly on Cardis' viability.

## V.    INDIVIDUAL ALLEGATIONS

123.    We detail below allegations as to the key Cardis individuals.

### A.    Defendant Fischman

124.    Defendant Fischman was the mastermind behind the Cardis scheme.

125.    As described above (*see supra* at ¶¶ 28-29), Defendant Fischman controlled Cardis, along with Defendants Brown, Katz, Hoffman, and Rosenblatt.  Defendant Fischman contributed to the Cardis fraud in a number of ways.

126.    First, Defendant Fischman was the overall orchestrator of the fraud.  Defendant Fischman set the terms of securities transactions with investors, directed the preparation of the false content in Defendant Brown's investor update letters, and arranged for others, like Defendant Hoffman, to fraudulently solicit investors.

127.    Second, as described below, Defendant Fischman personally solicited many investors and regularly made materially false representations and omissions.

    a.    Defendant Fischman regularly falsely told investors that Cardis would soon go public.  For example:

        i.    Defendant Fischman induced an investor to invest $3 million by representing that Defendant Fischman would take Cardis public within six months of his investment when, in fact, there was no plan in place to take Cardis public within six months of that investment.

        ii.    In February 2014, Defendant Fischman told an investor that Defendant Fischman expected an IPO in 12 months at 10 to 30 times the value at which Cardis stock was then being sold.

        iii.    On August 28, 2018, a Cardis investor, with others copied, sent a text message to Defendant Fischman, asking "Aaron, now that [it] is August 28th, did we go public per our last discussion on August 20th [?]"  Defendant Fischman did not respond to the text message. On August 30, the same Cardis investor sent Defendant Fischman another text message, asking, "Aaron, any news?"  Later that day, Defendant Fischman responded, "Trying guys.  Close !!"  The Cardis investor then asked in a text message to Defendant Fischman, "How close to going public?"  The next day, not having received a response from Defendant Fischman, the Cardis investor asked, "Any news?"  Defendant Fischman never responded to the Cardis investor.

    b.    Defendant Fischman regularly falsely overstated Cardis' third-party relationships with false statements and omissions consistent with those in Defendant Brown's investor update letters.  For example:

i.      On January 7, 2014, Defendant Brown e-mailed an investor, on Defendant Fischman's instruction, falsely representing that Cardis expected to close a deal with Roc Nation that month.

ii.     On May 6, 2014, Defendant Fischman sent an email to a Cardis investor, stating: "The head of MC [MasterCard] global endorsements told me that music is the cornerstone of MC's global strategy and that Cardis is [the] strategy to achieve this…We got something hot!!" In actuality, Cardis and Mastercard never materially advanced beyond technical discussions as to the feasibility of integrating Cardis' technology into Mastercard. Mastercard did not view Cardis as key to its strategy in the music industry. In fact, a partnership with Cardis could have jeopardized Mastercard's significant relationship with Apple because Cardis sought to create a Roc Nation music store that would compete with Apple's iTunes store. Mastercard never contemplated a financial investment in Cardis.

iii.    On October 29, 2014, Defendant Fischman e-mailed an investor with a "summary of Cardis' most advanced projects." The summary falsely claimed that a deal with RocNation would "go live" in January 2015 and that deals with ByStorm Entertainment, Primary Wave, and All Def Digital would similarly go live in the coming months. The e-mail also falsely claimed that Cardis would be "the exclusive payment system for PureSolo who projects to sell a minimum of 12 Million recordings per annum at a price of $1.95 per transaction." Each of these representations was false for the reasons discussed above.

iv.     On January 5, 2015, Defendant Fischman falsely represented to an investor that "The Mastercard contract is being sent to Roc Nation for signing and this is expected to be completed within 2 weeks."

v.        On February 1, 2015, Defendant Fischman falsely represented that "Tomorrow we are hopefully completing Master Card , Roc Nation contract, there is even more enthusiasm from MC then [sic] before for reasons I'll share tomorrow." This was false because Cardis could not reasonably expect to complete these deals in that, or any similar, time frame.

vi.       In May 2016, Defendant Fischman falsely told an investor that Municipal Parking Service would be rolling out Cardis-enabled parking meters in June 2016.

vii.      On September 6, 2016, Defendant Fischman received an email from a Cardis investor concerning the adoption of Cardis' technology in Municipal Parking Services' smart parking meters in Cedarhurst, New York. The investor asked: "[D]o you expect any revenue to come in over this six month period and if not when do you expect revenue / cash flow positivity to commence?" In response, Defendant Fischman wrote the following: "The meters go live within 30 days so revenue will begin." Similarly on January 19, 2017, Defendant Fischman e-mailed the same investor claiming that the meters would go "live" the next week. In reality, Cardis never rolled out its technology in Cedarhurst parking meters and was never on the verge of doing so, particularly because the town never approved the use of Cardis' technology and because MPS required, and Cardis failed to obtain, compliance with a payment industry protocol called PCI.

viii.    On September 6, 2016, on the instruction of Defendant Fischman, Defendant Brown sent an investor an e-mail asserting that Cardis was "looking to raise $1M to cover [its] operating budget for the next six months as [it] start[s] [its] deployment with MPS and finalize[s] the Cumberland deal and start[s] its deployment." In

actually, Defendant Fischman had no basis to represent that a deal with Cumberland Farms was in an advanced stage as claimed in the e-mail. Cardis had only a single meeting with Cumberland Farms, which did not occur until November 30, 2016. Thereafter, Cumberland Farms did not pursue a deal with Cardis.

ix. On February 17, 2017, Defendant Fischman falsely conveyed to an investor that the "rollout" with Municipal Parking Services was "estimated" to result in "$25 million per annum revenue to Cardis."

c. Defendant Fischman failed to disclose to Cardis' investors that he was converting investor funds for his own benefit and for the benefit of his family members and favored charities. This information was material to investors.

i. Defendant Fischman represented, and investors understood, that investor funds were needed, and were to be utilized, for the development of Cardis' technology and third-party relationships.

ii. However, in reality, Defendant Fischman, with the assistance of Defendant Katz, who controlled the principal Cardis bank account, siphoned off huge sums of investor monies to enrich Defendant Fischman, his family members, and various charities.

1. From January 2011 to November 2015, Defendant Fischman received at least $3 million through his closely-controlled company, Defendant Choshen, in order to support his lifestyle.

2. Defendant Fischman diverted substantial investor moneys to pay for his personal credit card expenses, which were significant, and for his catering expenses for his personal events.

27

3. Between January 2011 and May 2016, Defendant Fischman diverted investor moneys to his family members as follows:

   a. Relief Defendant Nina Fischman received at least $2 million of Cardis' investor moneys.

   b. Relief Defendant Stuart Fischman received at least $71,000 of Cardis' investor moneys.

   c. Relief Defendant Rafaela Fischman received least $19,000 of Cardis' investor moneys.

   d. Relief Defendant Alexander Fischman received at least $36,500 of Cardis' investor moneys.

   e. Relief Defendant Anne Shimanovich received at least $280,000 of Cardis' investor moneys.

   f. Relief Defendant Ethel Weissman received at least $129,000 of Cardis' investor moneys.

4. Between January 2011 and May 2016, Defendant Fischman directed more than $1 million worth of investor moneys to religious charitable organizations.

128. Third, Defendant Fischman failed to disclose to Cardis investors and potential investors that, in 1995, he and another one of Cardis' founders were permanently barred by the National Association of Securities Dealers, Inc. ("NASD") from associating with any member of NASD in any capacity. At that time, NASD was a securities industry self-regulatory organization and was one of the predecessors of the Financial Industry Regulatory Authority, Inc. ("FINRA"). Defendant Fischman's bar was part of a settlement of NASD allegations that he had: manipulated the price of a penny stock; failed to provide required risk disclosure statements

28

to customers prior to effecting trades in that penny stock; failed to provide the inside bid and ask quotations for the penny stock; failed to disclose the compensation to be received by his firm and his firm's associated persons; and failed to appear and provide testimony in connection with the investigation. This information would have been material to investors because it bore on the integrity of Cardis' principal officer and because Cardis was itself a penny stock.

129.    Fourth, Defendant Fischman failed to disclose that he repeatedly gave away Cardis stock to placate disgruntled investors in other failing companies backed by Defendant Fischman, thereby diluting the value of Cardis investors' stock without their knowledge.  For example:

a.    Defendant Fischman gave his movie production partner $40,000 worth of Cardis shares in exchange for the partner's $40,000 investment in the movie, which failed at the box office.

b.    Defendant Fischman directed Defendant Hoffman to tell an investor that Defendant Fischman would give the investor free Cardis stock in exchange for the investor's failed investment in another Fischman-related company.

c.    On March 25, 2014, Defendant Fischman gave a Cardis investor nearly two million Cardis shares for zero consideration in exchange for the investor's June 2008 investment in another Fischman-related company, which ultimately failed.

d.    On August 28, 2016, a Cardis investor emailed Defendant Fischman, asking the following:  "[R]egardless of a new investment, [are you] willing to offer the equivalent shares in Cardis to cover our disappointing investment in" another Fischman-related company.  Defendant Fischman responded as follows:  "We will issue the replacement equity for [the company], need to determine price."

29

130.     Defendant Fischman personally solicited numerous investors.  These investors relied on Defendant Fischman's false representations and omissions, described above, in investing in Cardis.  Defendant Fischman was also responsible, as the orchestrator of the Cardis fraud, for misstatements made by others, like Defendant Hoffman, on which investors relied.

**B.     Defendant Brown**

131.     Defendant Brown contributed to the Cardis scheme in a number of ways.

132.     First, as discussed above (*see supra* at ¶ 49), Defendant Brown prepared fraudulent projections that he distributed, or caused to be distributed to others.

a.     On October 7, 2011, Defendant Brown e-mailed his subordinate, who reported to Defendant Brown and acted at his direction, with a sample letter and investor information package that Cardis sent "to any new potential investor."  The package included false financial projections prepared by Defendant Brown.

b.     On December 9, 2011, Defendant Brown e-mailed a prospective investor with the same false financial projections.

c.     On January 4, 2012, Defendant Brown again e-mailed prospective investors with false financial projections.

d.     On May 18, 2012, Defendant Brown again provided his subordinate with the fraudulent projections as "introductary [sic] info [he] share[d] with new potential investors."

e.     On December 12, 2012, Defendant Brown's subordinate emailed a prospective investor with the same fraudulent projections.

f.     On February 20, 2013, Defendant Brown's subordinate e-mailed a prospective investor with updated projections that were fraudulent for the same reasons as the earlier version.

30

g.    On February 27, 2013, Defendant Brown again supplied his subordinate with a fraudulent projections table to be sent to prospective investors.

h.    On April 22, 2013, Defendant Brown again supplied his subordinate with fraudulent projections to be sent to prospective investors.

i.    On May 3, 2013, Defendant Brown's subordinate sent fraudulent projections to a prospective investor.

j.    On August 27, 2013, Defendant Brown provided his subordinate with the same fraudulent projections to be sent to a new group of potential investors.

k.    On August 28, 2013, Defendant Brown's subordinate e-mailed a prospective investor an investor deck, which contained Defendant Brown's false projections.

l.    On November 8, 2013, Defendant Brown's subordinate e-mailed a prospective investor a "New Investors Packet," which contained Defendant Brown's false projections.

m.    On December 8, 2014, Defendant Brown sent fraudulent financial projections to a prospective business partner.

n.    On December 9, 2014, Defendant Brown e-mailed updated fraudulent projections to a brokerage firm.

133.    Second, as discussed above (*see supra* at ¶ 31), Defendant Brown contributed to Cardis' fraud by preparing and directing the distribution of fraudulent investor update letters.

134.    Defendant Brown helped author, and signed, these investor update letters. Defendant Brown understood that these letters would be sent to a distribution list of current Cardis investors. For example:

31

a.   On August 1, 2012, Defendant Brown e-mailed other Cardis personnel an investor update letter directing that a subordinate add certain investors to his distribution list and distribute the letter the following day.

b.   On March 18, 2013, Defendant Brown e-mailed other Cardis personnel with an update he "would like to send out." That same day, Defendant Brown specifically directed a subordinate to "make sure that" individuals that were copied on the e-mail were included in investor communications.

c.   On August 14, 2013, Defendant Brown circulated a revised update for approval noting it was "ready for [another Cardis employee] to distribute."

d.   On March 29, 2014, Defendant Brown e-mailed other Cardis personnel a "Cardis update," which they were "free to share with investors."

e.   On August 5, 2014, Defendant Brown circulated for distribution an "Updated letter to investors."

f.   On December 24, 2014, Defendant Brown circulated for distribution another investor update letter.

g.   On October 27, 2015, Defendant Brown circulated for distribution another investor update letter.

135.   Below, we detail specific fraudulent statements from these update letters:

a.   In an August 15, 2013 letter, Defendant Brown wrote: "Cardis expects to be seeing revenues from the vending machine opportunity in its joint venture with Spindle as early as January 2014. To understand the enormity of this one specific opportunity, Spindle's contacts in the vending machine business alone can give Cardis access to over one million vending machines by 2015 with Cardis' share of the potential profit from these machines being in excess of $25M of free cash flow per year." In actuality, at the time of the letter, there was no joint venture. Nor was there ever a joint venture between Cardis and Spindle. Cardis

32

and Spindle had only entered into a mutual confidentiality agreement and letter of intent. Moreover, no work had been done to integrate Cardis' technology, and Cardis' technology was never incorporated into Spindle.

b.   In a March 3, 2014 letter, Defendant Brown wrote: "Together with RocNation, Cardis will be launching games centered on sports figures and music artists associated with RocNation. These sports figures and artists have a fan base of many millions of people." This was false because there were no plans for Cardis to launch games with RocNation.

c.   In a May 25, 2014 letter, Defendant Brown claimed that Cardis would be finalizing its agreements with all three major music labels within the next 30 to 60 days. In actuality, Cardis did not advance beyond high-level preliminary discussions with these music labels, and there was no basis to represent that Cardis would soon finalize agreements with the labels. For example, at the time of Defendant Brown's representation, only one introductory meeting between Cardis and each music company had taken place, and the parties had not even executed non-disclosure agreements.

d.   In a December 24, 2014 letter, Defendant Brown wrote: "ROC NATION - expected to go live January/February 2015 . . . Cardis is to be the official payment system for Roc Nation's on-line store and mobile apps showcasing 20 of Roc Nation's artists, including Rianna [sic] and JCole. We have done a Beta Pilot of the site and we recently received a demo which has been successfully reviewed by our technical staff. We received comments from Roc Nation on the final contract are [sic] we are close to finalizing." In actuality, the Roc Nation/Cardis store was not expected to go live in January/February 2015, as claimed, and the final contract was not "close to finalizing."

e.   In letters dated November 11, 2014 and December 24, 2014, Defendant Brown wrote to investors that Cardis was finalizing an agreement with PureSolo – a karaoke mobile application company. The letters

represented that Cardis would be "the exclusive payment system for PureSolo who projects to sell a minimum of 12 Million recordings per annum at a price of $1.95 per transaction." In actuality, these representations were false. First, there was no agreement between Cardis and PureSolo for Cardis to be "the exclusive payment system for PureSolo." PureSolo was only obligated to use Cardis' technology in PureSolo applications to the extent that Cardis was providing the marketing funds for that particular application. Additionally, the agreement only covered Android devices and did not include Apple IOS devices. Second, PureSolo's planned price point was $0.99 per transaction, not $1.95 per transaction, as Defendant Brown falsely represented. Third, PureSolo did not project a figure as high as 12 million sales per year.

f.    In letters dated November 11, 2014 and December 24, 2014, Defendant Brown wrote that Cardis was finalizing an agreement with ByStorm Entertainment to be its exclusive payment system and would "go live in late January 2015." In actuality, Cardis was not finalizing any agreement with ByStorm to be its exclusive payment system. The companies only had one introductory meeting.

g.    In letters dated November 11, 2014 and December 24, 2014, Defendants Brown wrote: "Cardis is in advanced negotiations to become the payment processor for Primary Wave." In actuality, PrimaryWave never entered into any negotiations with Cardis. At the time of these representations, Cardis and PrimaryWave had held only a single meeting, and PrimaryWave was waiting for Cardis to demonstrate the Cardis technology to PrimaryWave. That demonstration never occurred, and there are no e-mails between the parties after November 7, 2014.

h.    In a December 24, 2014 letter, Defendant Brown wrote: "ALL DEF DIGITAL (ADD) – expected to go live in February 2015[.] Cardis is

34

finalizing its agreement to be the exclusive payment system for All Def Digital, who is the pioneer record label in its revolutionary approach to market digital videos online." In actuality, nothing was expected to go live in the next two months, and Cardis was not finalizing any agreement with All Def Digital. All Def Digital was not even in the retail business.

    i.    Defendant Brown provided for distribution, an October 23, 2015 letter, signed by Defendant Fischman, which falsely represented that the relationship with Roc Nation was ongoing and Cardis "hope[d] to launch [its] payment app in the first quarter of 2016."

136.    Third, Defendant Brown made other false representations in one-to-one communications with investors.

    a.    On January 7, 2014, Defendant Brown e-mailed an investor, on Defendant Fischman's instruction, falsely representing that Cardis expected to close a deal with Roc Nation that month.

    b.    On January 22, 2014, Defendant Brown wrote the following: "The exit strategy remains the same – an IPO or merger. Just becoming a major process in the music and mobile payment industry alone can give us a multiple billion dollar valuation and is very achievable. We think we can become a major force in the industry by the end of 2014." This representation was false because "a multiple billion dollar valuation" was not "very achievable."

    c.    On May 25, 2014, Defendant Brown wrote the following to an investor: "Most important to our long term shareholders, the expanding opportunity with Mastercard can lead to the most diverse and greatest opportunities both business-wise and to a possible investment which hopefully can lead to a final exit down the road." This representation was false because there was no possibility of a Mastercard investment.

    d.    On November 4, 2014, Defendant Brown e-mailed an investor an October

35

2014 investor update letter that made materially false and misleading representations that Cardis had "the actual signed and executed contracts in hand" that would lead to "several live sites using Cardis' payments platform and generating revenue for Cardis." Without any basis in fact, the Cardis update letter represented that Roc Nation was expected to go live in January 2015, PureSolo was expected to go live in December 2014, ByStorm Entertainment was expected to go live in late November 2014, All Def Digital was expected to go live in January 2014 (sic), and Primary Wave was expected to go live in Q1 2015.

e.     On December 23, 2014, Defendant Brown prepared a schedule for use of investment proceeds that was sent to a Cardis investor. The schedule was materially false because it failed to disclose the substantial diversion of investor moneys detailed above (*see supra* at ¶ 127(c)).

f.     On February 11, 2016, in response to an investor's question "Is there a possibility for a 2016 tax write off loss?," Defendant Brown falsely claimed that there was "[s]till much going on" and hoped to "send out a good update" the following week. In fact, there was not "much going on" and no information that would justify "a good update" the following week.

g.     On September 6, 2016, Defendant Brown solicited investors via e-mail falsely representing that Cardis would be starting its "deployment with MPS" and "finaliz[ing] the Cumberland deal." In fact, Cardis was not starting its deployment with MS and was not finalizing the Cumberland deal.

137.     Defendant Brown also contributed to Cardis' fraud by falsely holding himself out as a senior financial officer of Cardis. Defendant Brown's true role would have been significant to an investor. Defendant Brown was personally highly regarded for his prior work as a senior executive at a major public company, as well as for being a significant charitable donor in the

36

Long Island communities in which Defendants lived and transacted business. Defendant

Brown's titles created the impression that he was highly involved with Cardis' finances, although

he was not. His titles also created the impression that Cardis was observing traditional corporate

financial formalities, which it was not. For example:

a. Defendant Brown alternatingly signed the investor update letters as "Senior Financial Executive" of "Cardis International, NV," "VP Finance," or "Financial Executive, Cardis" or "Financial Executive, Cardis International." A number of these letters simply indicated they were being issued from "Cardis" without greater specification, while some indicated they were from Cardis BV, the entity that issued Cardis shares. Below are screenshots from the December 24, 2014 letter to shareholders. They show that the letter used a Cardis logo on the front page, listed the source of the letter as Cardis BV (the entity that issued the shares), and described Defendant Brown as the VP, Finance.





December 24, 2014

Dear Investor

As we close out this year, the seeds planted in 2014 are ready to be harvested in 2015. Our strategy to focus on digital content as the best avenue to introduce the advantages of Cardis' technology in the digital payments world has taken hold and is not only gaining momentum in the business world but has also attracted positive press for us.

Attached to this letter, we are enclosing a recent article from Billboard discussing how Cardis' technology is going to revolutionize the music industry.
In addition we are attaching a recent press release from one of our new partners, ByStorm (see more information below) discussing how the implementation of Cardis' technology will enhance their business in 2015.

We are primed to start numerous deployments, discussed below, in the first quarter of 2015 and become a revenue generating operation.

The following list details business updates with our most likely ventures to be implemented in the next few months:

UNIVERSAL MUSIC –
Universal contacted our representative Seth Schachner to set up a meeting with Cardis as soon as possible regarding their intention to launch their own live-streaming operation as a means to move away from doing business with Spotify. This Universal-owned platform operation is to start in the UK and branch out to the US shortly thereafter. We believe the other major labels will want to replicate this business.
Universal is still in negotiations with Mastercard regarding its South American initiatives with Mastercard and Cardis. The UK initiative will most likely not include Mastercard (at least initially) because it is more time urgent, and the Mastercard process is a long process.

ROC NATION - expected to go live January/February 2015
Roc Nation is a full-service entertainment company that generates revenues from its client base through music publishing, touring, merchandising and provides management services to entertainers and sports figures. Cardis is to be the official payment system for Roc Nation's on-line store and mobile apps showcasing 20 of Roc Nation's artists, including Rianna and JCole.
We have done a Beta Pilot of the site and we recently received a demo which has been successfully reviewed by our technical staff. We received comments from Roc Nation on the final contract are we are close to finalizing.

Cardis Enterprises International B.V.
Prins Bernhardplein 200, Amsterdam 1097 JB,The Netherlands
E-mail: info@cardis-international.com
Phone: + 31 208 905 550
www.cardis-international.com

\*          \*          .     \*

Based on these developments, and the current momentum, we hope to have 25 Digital or Mobile App stores up and running in the next six months, and plan to do a "full-court" press to pursue Digital Game companies in 2015.

We continue to meet with Institutional Investors and have identified and started the investment process with three of them, who have expressed strong interest.

Please stay posted for future updates as we start our rollouts next month.

Yours truly,
Steve Brown,
VP Finance

b.    In September 2016, Defendant Brown continued to hold himself out as a Cardis financial executive by providing projections and other materials, in connection with the solicitation of an investor.

138.    Similarly, in a February 28, 2018 phone call with investors, Defendant Brown represented that he worked for Cardis over 60% of the time in 2011 to 2014, 35% of his time from 2014-2015, and "as needed" "thereafter" and that his "job always, you know was – my title was vice president of finance."

139.    Defendant Brown also contributed to Cardis' fraud by covering up Cardis' fraudulent activities.

a.    In summer 2012, Cardis investors raised concern as to "what funds have been spent to date trying to get the Company off the ground," including "[w]hat compensation" was received by the officers, the "hype that [investors] received at the time of investment," and that Cardis was a "ponzi scheme." Defendant Brown, Defendant Rosenblatt, and others met with Cardis investors to dissuade them from these concerns, which had merit.

b.    In July 2014, a Cardis investor wrote Defendant Fischman, Defendant Hoffman, and Defendant Rosenblatt, raising his concern that multiple investors had called him "to inquire about whether I know anything about the operation you guys are running, implying that they believe that you guys are involved in a real fraud." The investor noted that "[t]hese people are getting very restless . . . because . . . you guys have been telling them you are very close to a great deal for many years now and they no longer believe you." Defendant Brown then prepared a response dismissing the concerns as the product of a "few, minority, [sic] investors who continue to be angry at us, mostly because their investment has not been realized to date." The response went on to reject "accusations of a PONZI scheme" as "absurd on every level." It affirmed the accuracy of their past

representations and also made additional misrepresentations about Cardis' business prospects.

c. On October 27, 2014, Defendant Brown e-mailed the same investor, stating "it is my responsibility to keep investors updated," and falsely claiming Cardis was "on the cusp of signing and implementing several key groundbreaking agreements." The e-mail went on to reiterate a number of false representations concerning Cardis' relationship with third parties.

d. On September 24, 2015, a Cardis investor emailed Defendant Brown asking for the "latest on Cardis" and whether it was "a complete loss," while mentioning a recent investor lawsuit. Defendant Brown, copying Defendant Rosenblatt, responded that the lawsuit claiming fraud was "frivolous," while claiming that Cardis' relationship with Roc Nation was "developing" and ongoing. In fact, the lawsuit had merit, and Cardis' relationship with Roc Nation was long over.

e. On February 28, 2018, a Cardis investor recorded a telephone conversation with Defendant Brown. The investor asked "what happened to the cash" investors put into Cardis. Defendant Brown responded by detailing the Company's large budget and staff, while failing to disclose the substantial misuse of investor funds. The investor also questioned Defendant Brown about various investor lawsuits against Cardis and its principals. The investor asked: "After reading those lawsuits, why should we think that the company has any future?" In response, Defendant Brown told the investor "the lawsuits were not the most credible lawsuits," attributing them to "angry investors." Defendant Brown later told the investor "none of those lawsuits have any merit to them." In fact, there was substantial merit to the investor lawsuits.

140. Many Cardis investors directly relied on Defendant Brown's misrepresentations. For example:

a.   Defendant Brown's subordinate personally invested and invested on others' behalf based on Defendant Brown's involvement in Cardis as a senior financial officer and Defendant Brown's representations that Cardis was on the cusp of earning substantial revenue and realizing an IPO or buyout.

b.   Another investor repeatedly invested his own money and introduced others to the Cardis opportunity.  He regularly received Defendant Brown's updates and relied on them in choosing to invest in Cardis.

c.   An entity and several of its employees were repeat investors in Cardis with their most recent investments in 2016.  These investors relied on Defendant Brown's investor update letters when making their investments. These investors also relied on Defendant Brown's specific representation, in a September 6, 2016 e-mail, that Cardis would be deploying with MPS and Cumberland.

d.   Yet another investor relied on a January 7, 2014 e-mail from Defendant Brown that falsely claimed that Cardis expected to sign a deal with Roc Nation that month.

141.   Defendant Brown made these false statements recklessly, knowingly, or intentionally.  Defendant Brown failed to conduct a reasonable investigation concerning the statements he was relating.  Nor was it reasonable to rely on Defendant Fischman or others at Cardis.  There was no basis to believe these individuals were reliable, particularly because they never supplied Defendant Brown with materials that would corroborate Defendant Brown's representations.

142.   More broadly, Defendant Brown served a key role in the overarching fraudulent Cardis scheme and, as such, bears responsibility for the misstatements made by others in the scheme, on which investors relied.

41

C.     **Defendant Rosenblatt**

143.    Defendant Rosenblatt was an active participant in the Cardis scheme.  Defendant Rosenblatt contributed to the Cardis fraud in a number of ways.

144.    First, Defendant Rosenblatt participated in the dissemination of the false investor update letters described above.  This included the December 2014 and October 2015 investor update letter described above (*see supra* at ¶ 135), both of which were sent by Defendant Rosenblatt. Defendant Rosenblatt knew or should have known that these representations were false.

145.    Second, Defendant Rosenblatt had direct false communications with investors.

a.     On October 18, 2013, Defendant Rosenblatt wrote the following to an investor: "We [Cardis] now believe that the company will be doing an IPO within the next twelve months, we are signing some more major contracts in the next coming weeks."  These statements were false because no IPO was on the horizon and Cardis did not expect to sign major contracts in the coming weeks.

b.     On June 17, 2014, Defendant Rosenblatt forwarded an investor a copy of the false May 25, 2014 investor update letter described above.

c.     On July 14, 2015, Defendant Rosenblatt falsely represented that Cardis was "dealing with some major companies."

d.     On March 18, 2015, Defendant Rosenblatt falsely represented that Cardis was "finishing up the Roc Nation contract and should be signed by next week."

e.     Defendant Rosenblatt knew or should have known that each of these representations were false.

146.    Third, Defendant Rosenblatt participated in efforts to cover up Cardis' fraud.

a.    In or about September 2012, Defendant Rosenblatt, Defendant Brown, and others met with Cardis investors to dissuade them from their concern that Cardis was a "ponzi scheme."

b.    In or about July 2014, Defendant Brown, Defendant Rosenblatt, and Defendant Fischman coordinated a response to a concerned investor who raised investor fear that Cardis was a "PONZI scheme."

c.    On or about September 24, 2015, Defendant Brown and Defendant Rosenblatt emailed a disgruntled investor that a lawsuit claiming fraud was "frivolous," while claiming that Cardis' relationship with Roc Nation was "developing" and ongoing. In fact, the lawsuit had merit, and Cardis' relationship with Roc Nation was long over.

d.    Defendant Rosenblatt knew or should have known that each of these representations were false.

147.    Fourth, Defendant Rosenblatt was aware of, and failed to disclose that, Defendant Fischman repeatedly gave away Cardis stock to placate disgruntled investors in other failing companies backed by Defendant Fischman, thereby diluting the value of Cardis investors' stock without their knowledge. For example, Defendant Rosenblatt knew that Defendant Fischman gave investors in Romlight, another Fischman-backed venture, free Cardis stock.

148.    Fifth, Defendant Rosenblatt was aware of, and failed to disclose that, Defendant Fischman used a corporate credit card for personal purposes.

149.    Finally, Defendant Rosenblatt misrepresented the status of Defendant Brown. As discussed above, Defendant Rosenblatt disseminated investor update letters that falsely portrayed Defendant Brown as an active senior financial officer of Cardis.

150.    Defendant Rosenblatt made all of these false statements recklessly, knowingly, or intentionally. Defendant Rosenblatt failed to conduct a reasonable investigation concerning the

43

statements he was relating. Nor was it reasonable to rely on Defendant Fischman or others at Cardis. There was no basis to believe these individuals were reliable, particularly given that they never supplied Defendant Rosenblatt with materials that would corroborate Defendant Rosenblatt's representations.

151. Defendant Rosenblatt served a key role in the overarching fraudulent Cardis scheme and, as such, bears responsibility for the misstatements made by others in the scheme, on which investors relied.

### D. Defendants Hoffman and Zerp LLC

152. Defendants Hoffman and Zerp LLC were key participants in the Cardis fraud, being paid by Cardis until at least February 2017. Defendant Hoffman was one of Cardis' principal fundraisers raising, upon information and belief, over $20 million from investors. Defendant Hoffman operated on a commission basis with investment-based commissions directed to him or his company, Defendant Zerp LLC. Defendants Hoffman and Zerp LLC contributed to Cardis' fraud in two principal ways.

153. First, Defendants Hoffman and Zerp LLC, through Hoffman, made false representations in their communications with investors.

154. These Defendants relied on the investor updates prepared by Defendant Brown and information from Defendant Fischman – both of which contained material misstatements and omissions – in making pitches to investors. They have admitted, in their Answer and Cross Claim ("Answer"), that the information they conveyed was false.

155. For example, on July 26, 2016, Hoffman emailed an investor a copy of a press release dated the same day titled, "MPS Signs Agreement with Cardis to Implement Low Value Electronic Payments Solution in Their Smart Parking Meters." In a chain of emails from August

29 to 30, 2016, the investor asked Hoffman, "Should we invest more?"; Hoffman replied, "100% yes?!!"; the investor then asked, "Because of [MPS parking] meters?"; and Hoffman wrote back, "Yes and Cumberland stores." Defendant Hoffman knew or should have known that this representation was false.

156. Hoffman materially misrepresented the status of Cardis' business relationship with MPS, and the likelihood that Cardis investors would ever receive a profit from their investments in Cardis, because, in actuality, Cardis never rolled out its technology in Cedarhurst parking meters and was never on the verge of doing so, particularly because the town never approved the use of Cardis technology and because MPS required, and Cardis failed to obtain, compliance with a payment industry protocol called PCI. Defendant Hoffman also materially misrepresented that Cardis would soon enter into a revenue-generating relationship with Cumberland Farms. Defendant Hoffman knew or should have known that this representation was false. Defendant Hoffman had no basis in August 2016 – or ever – to represent that a deal with Cumberland Farms was in an advanced stage. Cardis had only a single meeting with Cumberland Farms, which did not occur until November 30, 2016. Thereafter, Cumberland Farms did not pursue a deal with Cardis.

157. Second, Defendants Hoffman and Zerp LLC were aware, and failed to disclose to investors, that Defendant Fischman repeatedly gave away Cardis stock to placate disgruntled investors in other failing companies backed by Defendant Fischman, thereby diluting the value of Cardis investors' stock without their knowledge. For example, Defendant Fischman directed Defendant Hoffman to tell, and Hoffman told, an investor that Defendant Fischman would give the investor free Cardis stock in exchange for the investor's failed investment in another Fischman-related company.

45

158.     Defendant Hoffman made these false statements recklessly, knowingly, or intentionally.  Defendant Hoffman failed to conduct a reasonable investigation concerning the statements he was relating.  By his own admission, Defendant Hoffman undertook no inquiry to determine if the representations he made to investors were true and was locked out of information regarding Cardis' true state.  Beyond that, there was no reasonable basis to rely on Defendant Fischman or others at Cardis.  There was no basis to believe these individuals were reliable, particularly given that they never supplied Defendant Hoffman with materials that would corroborate Defendant Hoffman's representations.

159.     As discussed above, Defendants Hoffman and Zerp LLC directly solicited investors and were responsible for, on information and belief, over $20 million in investments. These investors relied on Defendant Hoffman and Zerp LLC's representations when investing in Cardis.

**E.     The Katz Defendants**

160.     As discussed above, Defendant Lawrence Katz, through his law firms Defendants Law Offices of Lawrence Katz, Esq. PLLC and Law Offices of Lawrence Katz P.C. (the "Katz Firms"), controlled the principal Cardis bank account –an IOLA account maintained at Bank of America.  From this account, Defendant Katz and the Katz Firms siphoned off huge sums of investor monies to enrich Defendant Fischman, his family members, and various charities.

161.     Defendant Katz and the Katz Firms knew, or were reckless in not knowing, that these transfers were fraudulent based on the fact that they worked out of the Cardis offices, closely alongside Cardis' principal Defendant Fischman, and therefore would have been aware that these expenses were not Cardis-related.

46

162.     Defendant Katz and the Katz Firms' knowledge of the impropriety of these payments is also supported by the fact that, as described below, Defendant Katz and the Katz Firms themselves misappropriated investor money.

163.     From in or about March 2011 to in or about May 2016, Defendant Katz transferred more than $2.5 million from a Defendant Katz-controlled IOLA account at Bank of America, in which Cardis' investor moneys were deposited, to Defendant Katz's accounts maintained at Signature Bank, JPMorgan Chase, and HSBC Bank USA.  The transfers included: (1) $50,000 to a Defendant Katz-controlled account at Signature Bank; (2) more than $750,000 to Defendant Katz-controlled accounts at JPMorgan Chase; and (3) more than $1.7 million to Defendant Katz-controlled accounts at HSBC Bank USA.

164.     These transfers, and other transfers of Cardis investor money, were frequently used to fund Defendant Katz's own personal expenses such as groceries, restaurants, and clothes. For example:

    a.     In or about September 2014:

        i.     Defendant Katz transferred $40,000 from the Katz IOLA Account maintained at Bank of America into a JPMorgan Chase account, in the name of Law Offices of Lawrence Katz IOLA Trust Account, Account No. 7796.

        ii.     That same month, Katz transferred $25,000 from Account No. 7796 to a JPMorgan Chase account in the name of the Law Offices of Lawrence Katz IOLA Trust Account, Account No. 5614.

        iii.     That same month, Katz transferred $2,100 from Account No. 5614, to another JPMorgan Chase account, Account No. 0306, in the name of Law Offices of Lawrence Katz.

        iv.     Over the month, Defendant Katz spent or withdrew $2,624.19 from

the 0306 account, all of which appear to be for personal expenses. These include Trader Joe's, CVS, and Century 21.

b.    In or about October 2014:

    i.    Defendant Katz received $100,000 from a Cardis investor and deposited it into JPMorgan Chase Account No. 7796, in the name of Law Offices of Lawrence Katz IOLA Trust Account.

    ii.    Over the month, Katz transferred $7,000 from Account 7796 to Account No. 0306.

    iii.    Over the month, Defendant Katz spent or withdrew $5,840.81 from the 0306 account, all of which appear to be for personal expenses. These include Target, Costco, and a local supermarket.

c.    In or about June 2015:

    i.    Defendant Katz transferred $10,000 from the Katz IOLA Account maintained at Bank of America to a JPMorgan Chase account in the name of the Law Offices of Lawrence Katz IOLA Trust Account, Acct No. 5614.

    ii.    Over the month, Defendant Katz transferred $2,300 from that account to JPMorgan Chase Account No. 0306, in the name of Law Offices of Lawrence Katz.

    iii.    Over the month, Defendant Katz spent or withdrew $3,251.04 from the 0306 account, all of which appear to be for personal expenses. These expenses include purchases at Lord & Taylor, Gourmet Glatt in Cedarhurst, New York, and Target.

d.    In or about May 2016:

    i.    Defendant Katz transferred $50,000 from the Katz IOLA Account maintained at Bank of America to a Signature Bank Account

bearing the name Law Offices of Lawrence Katz, Esq, PLLC IOLA Account.

ii.  Over the month, Defendant Katz transferred $2,000 to a JPMorgan Chase Account, Account No. 2794, in the name of Law Offices of Lawrence Katz.

iii.  Over the month, Defendant Katz transferred $3,650 from Account No. 2794 to Account No. 0306.

iv.  Over the month, Defendant Katz spent or withdrew $3,778.64 from the 0306 account, all of which appear to be for personal expenses. These expenses include Urban Outfitters, Costco, and Victoria's Secret.

e.  There were no legitimate services provided in exchange for any of these payments, no invoices were issued, and there was no legitimate corporate reason to transfer the funds to Defendant Katz.

**FIRST CAUSE OF ACTION**
Scheme or Artifice to Defraud &
Material Misrepresentations and Omissions - GBL §§ 352(1) and 352-c

(as against Defendants Aaron D. Fischman, Stephen Brown, Steven Hoffman, Seth Rosenblatt, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, and Zerp LLC)

165.  Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

166.  The above-referenced Defendants together, and each of them individually, made materially false and misleading representations, statements, and promises, and omitted to state material information, to investors and potential investors about the nature of the securities, and the risks and potential returns of investing in those securities, issued, offered, and sold by these Defendants.  These misrepresentations and omissions were part of a single continuing scheme to defraud investors.

49

167.    Specifically, as detailed above:

    a.    Defendants Cardis, Fischman and Choshen Israel, LLC defrauded investors by misrepresenting Cardis' third-party relationships, misrepresenting the prospects of an IPO or buyout, by failing to disclose Defendant Fischman's prior FINRA discipline, failing to disclose that Fischman gave away stock to placate disgruntled investors from other failed Fischman ventures, failing to disclose Defendant Fischman's use of a corporate credit card for personal purposes, misrepresenting Defendant Brown's role in Cardis, and by failing to correct or update investors.  (*see supra* at ¶¶ 124-130),

    b.    Defendant Brown defrauded investors by misrepresenting Cardis' third-party relationships, misrepresenting the prospects of an IPO or buyout, misrepresenting Defendant Brown's role in Cardis, and by failing to correct or update investors.  (*see supra* at ¶¶ 131-142).

    c.    Defendants Hoffman and Zerp defrauded investors by misrepresenting Cardis' third-party relationships, misrepresenting the prospects of an IPO or buyout, failing to disclose that Fischman gave away stock to placate disgruntled investors from other failed Fischman ventures, misrepresenting Defendant Brown's role in Cardis, and by failing to correct or update investors.  (*see supra* at ¶¶ 152-159).

    d.    Defendant Rosenblatt defrauded investors by Cardis' third-party relationships, misrepresenting the prospects of an IPO or buyout, failing to disclose that Fischman gave away stock to placate disgruntled investors from other failed Fischman ventures, failing to disclose Defendant Fischman's use of a corporate credit card for personal purposes, and misrepresenting Defendant Brown's role in Cardis, and by failing to correct or update investors.  (*see supra* at ¶¶ 143-151).

168.    The foregoing acts and practices of these Defendants and their agents and

employees, consisting of materially false and misleading oral and written representations, statements, promises and omissions, constitute fraudulent acts and practices as defined in GBL §§ 352(1) and 352-c, are illegal and prohibited acts and practices pursuant to GBL §§ 352-c and 359-g(2), and are subject to the equitable remedies of permanent injunctive relief and restitution set forth in GBL § 353.

169.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Scheme or Artifice to Defraud – GBL §§ 352(1) and 352-c

(as against Defendants Aaron D. Fischman, Lawrence Katz, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, Law Offices of Lawrence Katz, Esq. PLLC, and Law Offices of Lawrence Katz P.C.)

170.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

171.    The above-referenced Defendants together, and each of them individually, together engaged in a scheme or artifice to defraud investors by siphoning off investor money to enrich these Defendants personally.

172.    Specifically, as detailed above (*see supra* at ¶¶ 124-130, 160-164):

a.    Defendant Fischman, with Defendant Katz's assistance, siphoned off huge sums of investor money, intended to benefit Cardis, to Defendant Choshen and to enrich Defendant Fischman personally.

b.    Defendant Fischman, with Defendant Katz's assistance, siphoned off huge sums of money to Relief Defendants Nina Fischman, Rafaela Fischman, Alexander Fischman, Stuart Fischman, Anne Shimanovich, and Ethel Weissman, all of whom were family members of Defendant Fischman.

c.    Defendant Fischman, with Defendant Katz's assistance, misappropriated investor moneys to fund charitable contributions.

    d.      Defendant Katz misappropriated substantial Cardis money to his own accounts, which he then used for personal expenses.

173.    The foregoing acts and practices of these Defendants constitute fraudulent acts and practices as defined in GBL §§ 352(1) and 352-c, are illegal and prohibited acts and practices pursuant to GBL §§ 352-c and 359-g(2), and are subject to the equitable remedies of permanent injunctive relief and restitution set forth in GBL § 353.

174.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

### THIRD CAUSE OF ACTION
Repeated and Persistent Fraud and Illegality – Executive Law § 63(12)

(as against Defendants Aaron D. Fischman, Stephen Brown, Steven Hoffman, Seth Rosenblatt, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, and Zerp LLC)

175.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

176.    The acts and practices alleged herein of each Defendant referenced above constitute conduct proscribed by Executive Law § 63(12), in that these Defendants engaged in repeated fraudulent acts, in violation of GBL § 352(1), or repeated illegal acts, in violation of GBL § 352-c, or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transaction of business. These fraudulent and illegal acts were part of a single continuing scheme to defraud investors.

177.    Specifically, these Defendants:

    a.      repeatedly violated the Martin Act, as detailed above in Count 1, by making materially false representations and omissions and engaging in a scheme or artifice to defraud investors.

    b.      repeatedly committed equitable fraud because investors justifiably and reasonably relied on their misrepresentations and omissions.

     c.     repeatedly committed actual fraud because investors justifiably and reasonably relied on relied on the misrepresentations and omissions, and because the fraud was conducted intentionally, knowingly, or recklessly.

178.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### Repeated and Persistent Fraud and Illegality – Executive Law § 63(12)

(as against Defendants Aaron D. Fischman, Lawrence Katz, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, Law Offices of Lawrence Katz, Esq. PLLC, and Law Offices of Lawrence Katz P.C.)

179.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

180.    The acts and practices alleged herein of each Defendant referenced above constitute conduct proscribed by Executive Law § 63(12), in that these Defendants engaged in repeated fraudulent acts, in violation of GBL § 352(1), or repeated illegal acts, in violation of GBL § 352-c, or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transaction of business. These fraudulent and illegal acts were part of a single continuing scheme to defraud investors.

     a.     Specifically, these Defendants: repeatedly violated the Martin Act, as detailed above in Count 2, by engaging in a scheme or artifice to defraud investors by siphoning off investor money to enrich these Defendants personally.

     b.     repeatedly committed equitable fraud because investors justifiably and reasonably relied on the premise that money invested in Cardis would be used for business purposes.

     c.     repeatedly committed actual fraud because investors justifiably and reasonably relied on the premise that money invested in Cardis would be

used for business purposes, and the fraud was conducted intentionally, knowingly, or recklessly.

### FIFTH CAUSE OF ACTION
Actual Fraud

(as against Defendants Aaron D. Fischman, Stephen Brown, Steven Hoffman, Seth Rosenblatt, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, and Zerp LLC)

181.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

182.    As alleged herein, and detailed in Counts 1 and 3, the above-referenced Defendants made material misrepresentations and omitted material facts as part of a single continuing scheme to deceive investors.

183.    The above-referenced Defendants made those material misrepresentations and omissions intentionally, knowingly, or recklessly.

184.    Upon information and belief, investors did in fact rely on the above-referenced Defendants' misrepresentations and omissions in making their investment and business decisions and such reliance was justifiable and reasonable.

185.    Investors suffered economic damages as a result.

186.    The above-referenced Defendants' conduct constitutes actual fraud under New York common law.

187.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

### SIXTH CAUSE OF ACTION
Equitable Fraud

(as against Defendants Aaron D. Fischman, Stephen Brown, Steven Hoffman, Seth Rosenblatt, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, and Zerp LLC)

188.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

189.     As alleged herein, and detailed in Counts 1 and 3, the above-referenced Defendants made material misrepresentations and omitted material facts as part of a single continuing scheme to deceive investors.

190.     Upon information and belief, investors did in fact rely on the above-referenced Defendants' misrepresentations and omissions in making their investment and business decisions and such reliance was justifiable and reasonable.

191.     These misrepresentations and omissions of material facts as alleged herein constitute equitable fraud under New York common law.

192.     Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

### SEVENTH CAUSE OF ACTION
Actual Fraud

(as against Defendants Aaron D. Fischman, Lawrence Katz, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, Law Offices of Lawrence Katz, Esq. PLLC, and Law Offices of Lawrence Katz P.C.)

193.     Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

194.     As alleged herein, and detailed in Counts 2 and 4, the above-referenced Defendants made material misrepresentations and omitted material facts as part of a single continuing scheme to deceive investors.

195.     The above-referenced Defendants made those material misrepresentations and omissions intentionally, knowingly, or recklessly.

196.     Upon information and belief, investors did in fact rely on the above-referenced Defendants' misrepresentations and omissions in making their investment and business decisions and such reliance was justifiable and reasonable.

197. Investors suffered economic damages as a result.

198. The above-referenced Defendants' conduct constitutes actual fraud under New York common law.

199. Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

## EIGHTH CAUSE OF ACTION
### Equitable Fraud

(as against Defendants Aaron D. Fischman, Lawrence Katz, Cardis Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises International BV, Choshen Israel, LLC, Law Offices of Lawrence Katz, Esq. PLLC, and Law Offices of Lawrence Katz P.C.)

200. Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

201. As alleged herein, and detailed in Counts 2 and 4, the above-referenced Defendants made material misrepresentations and omitted material facts as part of a single continuing scheme to deceive investors.

202. Upon information and belief, investors did in fact rely on the above-referenced Defendants' misrepresentations and omissions in making their investment and business decisions and such reliance was justifiable and reasonable.

203. These misrepresentations and omissions of material facts as alleged herein constitute equitable fraud under New York common law.

204. Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants and Relief Defendants as follows:

A.      Permanently enjoining Defendants from directly or indirectly engaging or attempting to engage in any manner in the issuance, exchange, sale, offer to sell, purchase, offer to purchase, promotion, negotiation, advertisement, investment advice, investment management, or distribution of any stocks, bonds, notes, evidences of interest or indebtedness, foreign currency orders, calls or options, or any other securities or commodities within or from the State of New York;

B.      Permanently enjoining Defendants from directly or indirectly engaging or attempting to engage in any manner in the securities or commodities business within or from the State of New York as a broker, dealer, issuer, investment adviser, or investment manager, or as an officer, director, principal, controlling person, agent, affiliated person, consultant, or salesman of a broker, dealer, issuer, investment adviser, or investment manager;

C.      Permanently enjoining Defendants from directly or indirectly engaging or attempting to engage in any manner in the writing, publishing, preparing, selling, or distributing any letter or other literature advising, suggesting, or in any other manner communicating advice within or from the State of New York with respect to the purchase or sale of securities or commodities; and from forecasting, advising, or in any other manner suggesting either orally or in writing any method or methods to be used in connection with the purchase or sale of securities or commodities;

57

D.      Pursuant to GBL § 353(3), directing Defendants, jointly and severally, to make restitution to defrauded investors of all moneys and property obtained directly or indirectly by the fraudulent acts and practices complained of herein, in an amount to be determined;

E.      Pursuant to Executive Law § 63(12), directing Defendants, jointly and severally, to make restitution and pay damages to defrauded investors of all moneys and property obtained from them, directly or indirectly as a result of the fraudulent and illegal acts and practices complained of herein, in an amount to be determined;

F.      Pursuant to the common law of the State of New York, directing all Defendants, jointly and severally, to pay damages suffered by defrauded investors as a result of the fraudulent acts and practices complained of herein, in an amount to be determined;

G.      Pursuant to the Court's equitable powers, directing Relief Defendants to disgorge all moneys and property received directly or indirectly from Defendants, or any of them, that constituted ill-gotten gains resulting from Defendants' fraudulent acts and practices against the defrauded investors, and to which moneys and property Relief Defendants have no legitimate claim, in amounts to be determined at trial, so that such moneys and property can be restored to the defrauded investors;

H.      Pursuant to GBL § 353-a, directing the appointment of a receiver to receive, for the benefit of defrauded investors, to take title to, and liquidate for the benefit of defrauded investors, all moneys and property derived by Defendants and Relief Defendants, or any of them, by means of any of the fraudulent acts and practices alleged herein, including also all moneys and property with which such moneys and property have been mingled, because such moneys and property cannot be identified in kind because of such commingling, together with any or all books of account and papers relating to such moneys and property;

I.      Directing that each Defendant pay Plaintiff an additional allowance of $2,000 pursuant to Civil Practice Law and Rules § 8303(a)(6), and an additional allowance of $2,000 pursuant to GBL § 353(1);

J.      Permitting Plaintiff to make further applications for such other and further relief as it appears to Plaintiff is proper and necessary for the enforcement of the judgment; and

K.      Awarding such other and further relief to Plaintiff as the Court may deem just and proper in the circumstances.

Dated: New York, New York
         August 30, 2019

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Plaintiff*


By: _____
         Jeffrey A. Novack
         Assistant Attorney General
         Investor Protection Bureau
         (212) 416-6178
         jeffrey.novack@ag.ny.gov

         Mary Kay Dunning
         Senior Enforcement Counsel
         Investor Protection Bureau

         Verle Johnson
         Assistant Attorney General
         Investor Protection Bureau


*Attorneys for Plaintiff*
*People of the State of New York*

Of Counsel:

Kevin Wallace
Acting Bureau Chief
Investor Protection Bureau