# EXHIBIT 13

## SOURCE CODE LICENSE AGREEMENT

THIS SOURCE CODE LICENSE AGREEMENT ("Agreement") is made and entered into as of this ___ day of April, 2018 (the "Effective Date") by and between Cardis Enterprises International (USA), Inc., Delaware corporation with its principal place of business at 120 Maple Avenue, Cedarhurst, NY 11516 ("Licensor") and Ultimas, Inc., a Delaware corporation, with its principal place of business at 420 Lexington Avenue, New York, NY 10170 ("Licensee").

WHEREAS, Licensor is the owner of all rights in and to one or more software applications designed as a credit card payment aggregation platform, as further described in Schedule "A" (the "Software");

WHEREAS, Licensee desires to obtain an exclusive license to use and modify the source code of the Software (the "Source Code") for use in connection with developing a payment processing aggregation platform for cryptocurrency-based payments (the "Field of Use").

NOW THEREFORE, in consideration of the mutual promises set forth herein, the parties hereto agree as follows:

### 1. THE LICENSE

1.1 **License.** Subject to the terms and conditions set forth herein, Licensor hereby grants to Licensee, a perpetual, exclusive, worldwide license to use, display, backup, perform, transmit, copy, compile, modify, creative derivative works (the "License") of the Source Code ("Derivative Works"), within the Field of Use.

1.2 **Ownership of Derivative Works.** Licensee shall exclusively own all right, title and interest in and to such portion of a Derivative Works which has been created by or on behalf of Licensee (the "Licensee Created Work"). Licensee shall not have any obligation or duty to provide Licensor with copies, or notice of the development, of any Derivative Works.

1.3 **Restrictions on License.** Licensee shall not use the Software and the Source Code in any manner not specifically permitted under this Agreement; provided that, Licensee may sublicense the Source Code to its third party contractors to create Derivate Works on behalf of Licensee, provided such contractor executes a confidentiality agreement protecting Licensor' rights to the Source Code to at least the same degree as set forth herein. To the degree that the Licensee's exercise of any rights granted by the Licensor hereunder would infringe upon any patent held by the Licensor or its affiliates, the right to practice any such patent, is hereby deemed permitted.

1.4 **Term.** The License shall commence on the Effective Date and will remain in effect unless terminated pursuant to the provisions of this Agreement.

1.5 **Delivery of Source Code.** Within ten (10) business days of the execution hereof, Licensor shall cause Licensee to have access to the latest version of the source code for the Software, together with all information reasonably necessary for Licensee to assemble, compile, link or otherwise "build" an executable version of the Source Code, as well as all documentation reasonably required for Licensee to use and modify the Source Code ("Source Code Delivery"). In the event that Licensor shall not be able to provide Licensee with access to the Software, Licensee's sole remedy will be to terminate this Agreement with no further liability to either party.

## 2. LICENSE FEE

2.1 **Royalty.** In consideration of the licenses granted herein, Licensee shall pay to Licensor, on a quarterly basis, a royalty equal to five percent (5%) of Licensee's "Gross Revenues" generated from the processing of cryptocurrency-based payments in such calendar quarter (the "Royalty"). For the purposes of this Agreement, Gross Revenues shall mean all revenues received and recognized by Licensee in accordance with Generally Accepted Accounting Principals ("GAAP") from all payments processed by Licensee for third parties utilizing the all or any part of the Software, the Derivative Works and/or the Licensee Created Work during such calendar quarter. Licensor shall have the right, at such Licensor's option, at any time and from time to time prior to a public offering of Licensee's shares or membership interests, to convert up to 50% of the Royalty into ownership interests in the Licensee for the same Royalty percentage converted. For example, if Licensor elects to convert 2% of its Royalty hereunder (leaving it with a 3% Royalty out of the original 5% set forth above), Licensor shall receive a 2% ownership interest in Licensee (which ownership interest shall be registered in the Licensee's public offering). Upon conversion, Licensor's ownership interest may not be diluted by Licensee except in a manner pro rata with all ownership interests in Licensee. Licensor may send notice of conversion (a "Conversion Notice") by regular mail and/or email to Paul Goodman, Esq., Cyruli Shanks Hart & Zizmor, LLP, 420 Lexington Avenue, Suite 2320, New York, New York 10170; email pgoodman@CSHZLAW.com.

2.2 **Advance Payment and Royalty Advance.** Within one hundred twenty (120) days of the execution hereof, Licensee shall pay to Licensor (a) a one-time non-refundable license fee in the amount of Two Million ($2,000,000.00) Dollars (the "License Fee") and (b) a non-refundable advance payment against future Royalty, as defined below, payments in the amount of Three Million ($3,000,000.00) Dollars (the "Royalty Advance")

2.3 **Payments and Reporting.** Licensee shall pay, within sixty (60) days after the end of each calendar quarter, the Royalty payment due to Licensor for such calendar quarter. Each such payment shall be accompanied by Licensee's quarterly Statement of Operations prepared in accordance with GAAP and certified by Licensee's management, together with a written report containing reasonable detail explaining the calculation of the Royalty due to Licensor. Within one hundred twenty (120) days of the end of each calendar year, the Licensee will provide the Licensor with a copy of Licensee's audited Statement of Operations. Licensor reserves the right to charge interest on any undisputed

overdue amounts at a rate of one and one-half percent (1.5%) per month or the maximum rate permitted by applicable law, whichever is less, from the due date until paid plus reasonable costs incurred in collection (including reasonable attorneys' fees).

2.4 **Exchange Rate.** In computing Royalties, Licensee shall convert any revenues it receives in foreign currency and cryptocurrency into its equivalent in United States dollars at the highest exchange rate Licensee uses to make reports to relevant regulatory and taxing authorities, as long as such accounting procedures are consistent with fair business practices and generally accepted accounting principles.

2.5 **Books and Records.** Licensee shall keep complete, true and accurate books of account and records for the purpose of determining the royalty amounts payable hereunder. Such books and records must be kept at the principal place of business of Licensee in the United States for a period of not less than six years following the end of the calendar quarter to which they pertain. Licensor may audit such books to ensure Licensee's compliance with this Agreement, provided that each such audit: (i) occurs during business hours, and upon no less than ten business days notice to Licensee; (ii) is conducted by a certified public accountant chosen by Licensor and approved by Licensee, such approval not to be unreasonably withheld; (iii) the results of such audit are considered the confidential information of Licensor, and both Licensor and the auditor will be required to sign a non-disclosure and non-use agreement limiting disclosure and use of such information; and (iv) occurs no sooner than one year after the most recent prior audit. Licensor shall pay all expenses relating to each audit, unless an audit reveals an underpayment exceeding 5% of the amount stated for the period covered by the audit, in which case all costs relating to the inspection and any unpaid amounts will be paid by Licensee.

## 3. RIGHTS AND OBLIGATIONS

3.1 **Representations and Warranties.** Licensor represents and warrants that:

(a) Licensor is the sole owner of all right, title and interest in the Software and all applicable rights to patents, copyrights, trademarks and trade secrets inherent or embodied therein or appurtenant thereto and that it has the right to grant the License, free and clear of any liens, charges and encumbrances or any claims of third parties (including, without limitation the owner(s) of the Software) whatsoever except that (i) Licensor has granted a security interest in the Software to Freshtree Techonolgy, Ltd. by agreement dated January 25, 2018 to secure repayment of a promissory note of even date therewith in the amount of $135,000 with a maturity date of April 30, 2018; (ii) on January 21, 2016 a judgment by Confession was entered against Licensor in the amount of $2,576,442.78 in favor of Shalom S. Maidenbaum in the Supreme Court of the State of New York, County of Nassau and an execution dated January 22, 2018 was served on the Licensor's New York office seeking the sale of US Patent Numbers 6467685, 6076075, 6065675 and 6119946 to satisfy the judgment; and (iii) on March 13, 2018 a judgment was entered against Licensor in favor of Simon Stern, Fredrick Stern, Moshe Stern, Daniel Stern and Raphael Stern in the amount of $75,000 and the Licensor has entered into a forbearance agreement to pay off the judgment;

3

(b) Licensee's use of the Software in accordance with this Agreement does not infringe any right, including without limitation, any intellectual property rights of any third party (including, without limitation the owner(s) of the Software);

(c) No claim has ever been asserted, and to the best of Licensor's knowledge, no claims are pending, challenging or questioning the validity or enforceability of any of Licensor' rights relating to the Software;

(d) Licensor is duly organized, validly existing and in good standing under the laws of Delaware and has the requisite power and authority to enter into and perform its obligations under this Agreement;

(e) Licensor is duly authorized by all requisite action to execute, deliver and perform this Agreement;

(f) The entry into this Agreement by Licensor will not violate or breach any written agreement between Licensor and any third party.

(g) Licensor has not utilized any open source software in the Software and Licensee will have no obligation to publish any of the source code or object code of the Software of the Licensee Created Work.

3.2 **Exclusivity.** During the term of this Agreement, Licensee shall have the exclusive right to utilize the Software, in either source code or object code form, within the Field of Use.

3.3 **Proprietary Rights.** Licensee acknowledges that Licensor retains all ownership rights in the Software including the source code therefor (other than Licensee Created Work), and that the Software and is the sole property of Licensor, including all applicable rights to patents, copyrights, trademarks and trade secrets inherent or embodied therein or appurtenant thereto. Licensee acknowledges that it is not purchasing title to the Software including the Source Code, but is rather being granted a license to use the Software in accordance with this Agreement. Licensor acknowledges that Licensee retains all ownership rights in the Licensee Created Work, and that the Licensee Created Work are the sole property of Licensee, including all applicable rights to patents, copyrights, trademarks and trade secrets inherent or embodied therein or appurtenant thereto. Licensee agrees not to: (a) modify, adapt, alter, translate or create any derivative works from the Software other than the Derivative Works for the Field of Use; (b) sell, sublicense, lease, rent, loan, encumber, pledge, assign, convey, disclose or otherwise transfer or make available the Software or any component thereof to any third party other than the Derivative Works for the Field of Use; (c) otherwise copy or use the Software for any purpose or in any manner not expressly permitted in this Agreement or authorized in writing by Licensor; or (d) knowingly permit or encourage any third party to do any of the foregoing. All rights in and to the Software not expressly acknowledged by Licensor and/or granted to Licensee in this Agreement are reserved by Licensor.

3.4 **Application and Use.** Except as expressly provided herein, Licensee shall not sell, transfer, disclose, publish, display or otherwise make available to others any

portion of the Software (including the Source Code) other than to Licensee's employees and independent consultants with which Licensee has executed confidentiality agreements in a form reasonably acceptable to Licensor. Licensee agrees to secure and protect the Software (including the Source Code) in a manner consistent with Licensee's policies for the protection of its own confidential information and consistent with the maintenance of Licensor' rights therein. Licensee agrees to take appropriate action by instruction or agreement with its employees and independent consultants who are permitted access to the Software (including the Source Code) to satisfy its obligations hereunder. Licensee shall use commercially reasonable efforts to assist Licensor in identifying and preventing any unauthorized use or disclosure of the Software (including the Source Code) or any portions thereof. Without limiting the foregoing, Licensee shall promptly advise Licensor in the event Licensee learns of or has reason to believe that any person who Licensee has given access to the Software (including the Source Code), or any portion thereof, has violated the terms of this Agreement and Licensee will cooperate with Licensor in seeking injunctive or other equitable relief in the name of Licensor against any such person. Further, Licensee shall utilize commercially reasonable practices, as such practices may evolve over time, to prevent unauthorized access to any computer on which a copy of the Source Code is stored and shall promptly inform Licensor in the event Licensee shall learn that any third party has obtained access to the Source Code through unauthorized or improper means.

3.5 **Confidentiality.** Each party agrees to maintain the confidentiality of any information regarding the business affairs, property or method of operation or other information (collectively, "Confidential Information") related to the other party that either party obtains during the term of this Agreement. Each party agrees that all information which relates in any way to the other party's business or operations, whether tangible or intangible and in whatever form or medium, including, but not limited to, information relating to current or contemplated operations; identity of customers and/or suppliers of goods and/or services; trade secrets (including any improvements thereto), whether in development, prototype or finished form and whether patentable or not; computer software; all financial, personnel, and other business data; and unpublished or published copyrighted materials, including any improvements, modifications, or additions to any of the above information, and other information identified as confidential by a party, are Confidential Information. Notwithstanding anything to the contrary contained in this Agreement, neither party shall be obligated to treat as confidential, or otherwise be subject to the restrictions on use, disclosure or treatment contained in this Agreement for, any information disclosed by the other party (the "Disclosing Party") which: (i) is rightfully known to the recipient prior to its disclosure by the Disclosing Party; (ii) is released by the Disclosing Party to any other person, firm or entity (including governmental agencies or bureaus) without restriction; (iv) is independently developed by the recipient without any reliance on Confidential Information; or (v) is or later becomes publicly available without violation of this Agreement or may be lawfully obtained by a party from any nonparty. In the event a party is required to disclose Confidential Information in judicial, administrative or government proceedings pursuant to applicable law, regulation, court order or other legal process, such party shall prior to such disclosure provide the Disclosing Party with reasonable advance notice, and at the

Disclosing Party's request and expense, cooperate with the Disclosing Party in contesting or limiting such request.

**3.6 Warranties.** Licensor warrants to Licensee that the Source Code shall assemble, compile, link or otherwise "build" an executable version of the Software which conforms with the last version of the specifications for the Software. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT THE SOFTWARE IS PROVIDED "AS IS." LICENSOR MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND THE SOFTWARE AND THE SOURCE CODE ARE PROVIDED "AS IS".

**3.7 Limitation of Liability.** NEITHER PARTY SHALL HAVE LIABILITY WITH RESPECT TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR OTHERWISE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND EXCEPT LICENSEE'S UNPAID ROYALTY OBLIGATIONS HEREUNDER, IN NO EVENT SHALL EITHER PARTY'S LIABILITY FOR ANY REASON AND UPON ANY CAUSE OF ACTION WHATSOEVER EXCEED THE PAYMENTS MADE BY LICENSEE TO LICENSOR UNDER THIS AGREEMENT.

**3.8 Termination.**

(a) _Termination by Licensor._ In addition to its rights as set forth elsewhere in this Agreement, Licensor shall have the right to terminate this Agreement for any of the following reasons if not cured within sixty (60) days after written notice from Licensor:

    (i) material violation or material breach by Licensee, its officers or employees of any provisions of this Agreement, including, but not limited to, payment;

    (ii) voluntary or involuntary filing of bankruptcy petition or similar proceeding under state law with respect to Licensee;

    (iii) Licensee's becoming insolvent or making any assignment for the benefit of creditors;

    (iv) Failure to timely pay the Royalty Advance; and

    (v) Any attempted assignment of this License by Licensee other than as permitted by Section 4.5.

Upon the termination of this Agreement by Licensor under this Section 4.8(a), all licenses granted to Licensee hereunder shall immediately terminate and Licensee shall stop utilizing the Software in all forms after a ninety (90) day wind-down period. Following such wind-down period, Licensee shall promptly return to Licensor any and all copies of the Source Code and the Software all copies thereof, and any materials incorporating any portion thereof, in Licensee's possession or control. Furthermore,

Licensee shall destroy all copies stored in any form of digital storage of the Software and shall certify in writing to Licensor that the same have been destroyed.

(b) <u>Termination by Licensee</u>. In addition to its rights as set forth elsewhere in this Agreement, Licensee shall have the right to terminate this Agreement upon any material breach by Licensor of any provisions of this Agreement if not cured within sixty (60) days after written notice from Licensee.

(c) <u>Remedies</u>. All remedies under this Section are in addition to, and not in lieu of, any and all legal remedies, including equitable relief, available to a party to enforce its rights under this Agreement.

(d) <u>Section 365(n) Rights</u>. The parties agree that all Software delivered pursuant to this Agreement constitute "intellectual property" under Section 101(35A) of the U.S. Bankruptcy Code (the "Code") Section 101(35A). Licensor agrees that if it, as a debtor-in-possession, or if a trustee in bankruptcy for Licensor in a case under the Code, rejects this Agreement, Licensee may elect to retain its rights under this Agreement as provided in Section 365(n) of the Code. Any intellectual property rights, licenses or assignments from Licensee, of which Licensor may have the benefit, shall receive the full protection granted to Licensor by applicable bankruptcy law.

## 4. GENERAL

4.1 **Entire Agreement.** Each party acknowledges that this Agreement constitutes the complete and exclusive statement of the terms and conditions between the parties, which supersedes and merges all prior proposals, understandings and all other agreements, oral and written, between the parties relating to this Agreement. This Agreement may not be modified or altered excepted by written instrument duly executed by both parties.

4.2 **Force Majeure.** Neither party shall be liable for any failure or delay in performing its obligations under this Agreement or for any loss or damage resulting therefrom, due to causes beyond its reasonable control, including, but not limited to, acts of God, public enemy or government, riots, fires, natural catastrophes, strikes or epidemics (collectively, "Force Majeure"). Each party shall notify the other promptly of any failure or delay and the effect on its performance. Except as expressly agreed by the other party, a Force Majeure Event may delay but does not obviate a party's payment obligations hereunder.

4.3 **Governing Law.** This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules, and shall be resolved in a proceeding within the State of New York.

4.4 **Enforceability.** If a court holds any provision of this agreement or its application to any person or circumstance invalid, illegal or unenforceable, the remainder of this agreement, or the application of such provision to persons or circumstances other than those to which it was held to be invalid, illegal or unenforceable, shall not be

affected, and shall be valid, legal and enforceable to the fullest extent permitted by law, but only if and to the extent such enforcement would not materially and adversely frustrate the parties' essential objectives as expressed in this agreement. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties intend that the court add to this agreement a provision as similar in terms to such invalid, illegal or unenforceable provision as may be valid and enforceable, so as to effect the original intent of the parties to the greatest extent possible..

4.5 **Assignment.** Licensee may not assign its rights, duties or obligations under this Agreement, in whole or in part, to any person or entity, without prior written consent of Licensor; provided, however, that Licensee may, without the consent of the Licensor, assign its rights hereunder to any entity under common ownerships, parent entity, subsidiary entity or any entity which acquires Licensee or merges with Licensee. Any such attempted assignment in violation of the foregoing shall be void and shall constitute a material breach of this Agreement.

4.6 **Notice.** All notices, requests, claims, demands and other communications hereunder shall be in writing. Such notices shall be given by a nationally recognized next day courier service to the address of the party specified above or such other address as either party may specify in writing.

4.7 **No Waiver.** The waiver or failure of either party to exercise any right in any respect provided for herein shall not be deemed a waiver of any further right hereunder.

4.8 **Remedies.** The rights and remedies of either party set forth in this Agreement are not exclusive and are in addition to any other rights and remedies available in law or in equity.

4.9 **Headings.** Headings and titles of sections are for convenience and shall not control the construction or interpretation of any provisions herein.

4.10 **Relationship of Parties.** The relationship of Licensor and Licensee established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to: (a) give either party the power to direct and control the day-to-day activities of the other, (b) constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking, or (c) allow either party to create or assume any obligation on behalf of the other party for any purpose whatsoever. Licensee shall, as an independent contractor, be responsible for obtaining liability and all other types of insurance including, but not limited to, workman's comp insurance, and for obtaining all necessary licenses, and permits, and the preparation and filing of all reports, and paying all taxes and costs as required by local, state or federal laws.

4.11 **Counterparts; Facsimile Transmission.** This Agreement and all amendments hereto may be executed in several counterparts and each counterpart shall constitute a duplicate original of the same instrument. Signatures sent to the other party

by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed and delivered by their duly authorized agents, all as of the Effective Date stated above.

LICENSOR

By: _____
Name: Jonathan Nierenberg
Title: CEO

LICENSEE

By: _____
Name: Paul Buchman
Title: Director

# AMENDMENT TO SOURCE CODE LICENSE AGREEMENT

AMENDMENT TO SOURCE CODE LICENSE AGREEMENT ("Amendment") dated April ___, 2018 by and between Cardis Enterprises International (USA), Inc., ("Licensor") and Ultimas, Inc ("Licensee") (the "Agreement").

In consideration of the mutual promises contained herein, the parties agree to amend the Agreement as follows:

1. Section 2.1, **"Royalty"** is amended to read as follows.

**Royalty.** In consideration of the licenses granted herein, Licensee shall pay to Licensor, on a quarterly basis, commencing on June 30, 2019 (the "Royalty Payment Commencement Date"), a royalty equal to five percent (5%) of Licensee's "Gross Revenues" generated from the processing of cryptocurrency-based payments in such calendar quarter (the "Royalty"). Commencing on the Royalty Payment Commencement Date, Licensee shall pay to Licensor, a guaranteed minimum quarterly royalty of Two Hundred Fifty Thousand ($250,000.00) Dollars (the "Quarterly Minimum Royalty") until such time as the total royalties paid to Licensor under this Agreement equals Five Million ($5,000,000.00) Dollars (the "Minimum Royalty Amount") which shall cover the first $100,000,000 in Gross Revenues (the "Gross Revenue Threshold").

After Licensee's aggregate Gross Revenues have reached the Gross Revenue Threshold, Licensee shall continue to pay Licensor on a quarterly basis a quarterly Royalty on all Gross Revenues generated over and above the Gross Revenue Threshold ("Additional Royalties"). If the Gross Revenue Threshold is reached before the fifth anniversary of the Royalty Payment Commencement Date, all Additional Royalties earned in any quarter for which a Quarterly Minimum Royalty is due shall be paid in full with each Quarterly Minimum Royalty.

For the purposes of this Agreement, Gross Revenues shall mean all revenues received and recognized by Licensee in accordance with Generally Accepted Accounting Principals ("GAAP") from all payments processed by Licensee for third parties utilizing the all or any part of the Software, the Derivative Works and/or the Licensee Created Work during such calendar quarter. Licensor shall have the right, at such Licensor's option, at any time and from time to time prior to a public offering of Licensee's shares or membership interests, to convert up to 50% of the Royalty into ownership interests in the Licensee for the same Royalty percentage converted. For example, if Licensor elects to convert 2% of its Royalty hereunder (leaving it with a 3% Royalty out of the original 5% set forth above), Licensor shall receive a 2% ownership interest in Licensee (which ownership interest shall be registered in the Licensee's public offering). Upon conversion, Licensor's ownership interest may not be diluted by Licensee except in a manner pro rata with all ownership interests in Licensee. Licensor may send notice of conversion (a "Conversion Notice") by regular mail and/or email to Paul Goodman, Esq.,

Cyruli Shanks Hart & Zizmor, LLP, 420 Lexington Avenue, Suite 2320, New York, New York 10170; email pgoodman@CSHZLAW.com.

2. Section 2.2, "Advance Payment and Royalty Advance" is hereby amended to read as follows

**Advance Payment and Royalty Advance.** Licensor hereby acknowledges that after payment of approximately $175,000 to Freshtree Technologies, Ltd., Licensee has paid to Licensor a total of $234,000.00 as an advance against Royalties due to the Licensor (the "Advance"). Licensor shall apply the Advance against the Quarterly Minimum Royalty at a rate of $75,000.00 per quarterly.

3. **Compliance with all Laws.** Licensee must conduct its business activities in compliance with all applicable rules, laws and regulations that govern the jurisdictions in which Licensee conducts its business including, without limitation, Federal and State securities laws.

4. **No Other Changes.** Except as set forth herein, the provisions of the Agreement shall not be deemed to be modified and shall remain in full force and effect.

5. **Counterparts.** This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be deemed originals.

**IN WITNESS WHEREOF,** the parties have caused this Amendment to be signed and delivered by their duly authorized agents.

| LICENSOR | LICENSEE |
|---|---|
| By: _____ | By: /s/ |
| Name: | Name: Paul Goodwin |
| Title: | Title: Interim President |

GSB:9665855.2

2